(No. 73224.—

CONGREGATION OF THE PASSION, HOLY CROSS PROVINCE, Appellee, v. TOUCHE ROSS AND COMPANY, Appellant.

*Opinion filed April 21, 1994.—Rehearing denied May 27, 1994.*

NICKELS, J., took no part.
FREEMAN, J., specially concurring.
HEIPLE, J., joined by HARRISON, J., dissenting.

Daniel P. Ward, Francis J. Higgins and John J. Verscaj, of Bell, Boyd & Lloyd, of Chicago, for appellant.

Thomas P. Ward, of McBride, Baker & Coles, and David C. Gustman, Margaret S. Garvey and Thomas Kottler, of Freeborn & Peters, all of Chicago, for appellee.

JUSTICE MILLER delivered the opinion of the court:

Plaintiff, Congregation of the Passion, Holy Cross Province, brought suit against the defendant, Touche Ross & Company, in the circuit court of Cook County alleging damages resulting from defendant's preparation of financial statements for plaintiff's use. The jury returned verdicts in favor of plaintiff and against defen-

dant for $3.9 million on the negligence count and $1.5 million on the breach of contract count. A directed verdict in favor of defendant had previously been entered on a fiduciary duty count. The trial court entered judgment against defendant for $3,819,352, and the appellate court affirmed. (224 Ill. App. 3d 559.) We allowed defendant's petition for leave to appeal (134 Ill. 2d R. 315), and now affirm the judgment of the appellate court.

Plaintiff is a corporate entity and an order of the Roman Catholic Church. It operates monasteries, retreat houses, and schools. Plaintiff meets its operating expenses by use of contributions and investment income. Rather than make its own investment decisions, plaintiff hires investment advisors to manage its accounts. Defendant is an accounting firm with offices in Chicago and in many other cities throughout the world.

In 1973, plaintiff decided to replace its previous accounting firm with defendant, Touche Ross. Plaintiff and defendant executed an "engagement letter" which listed the services defendant would render for plaintiff. The engagement letter was for a term of one year. On or about June 30 each year, when plaintiff's fiscal year ended, defendant presented a new engagement letter to plaintiff. In each of the engagement letters, defendant agreed to prepare an unaudited financial statement for plaintiff's use for the fiscal year just ended.

Between defendant's preparation of the 1975 and 1976 fiscal year financial statements, plaintiff appointed Cranford D. Newell of San Francisco, California, as an investment advisor. Plaintiff committed two funds to Newell's control: the "retirement fund" and the "permanent fund." Each fund initially consisted of approximately $1 million. By written agreement, Newell was given full discretionary authority over all investment decisions regarding the two funds.

Newell dealt mainly in government bonds with fixed interest rates. Newell employed a modified "arbitrage" trading strategy. He would buy a bond issue that seemed to be trading lower than government bonds generally, and simultaneously sell short an issue trading higher than securities with similar coupons and maturities. If the market stabilized as Newell anticipated, market forces would move each issue price closer to the prices of other government bonds. The transaction could then be liquidated at a profit. Newell entered into these transactions through accounts held with numerous securities dealers. These transactions were highly leveraged, and although plaintiff had entrusted to Newell only $2 million, Newell held positions on behalf of plaintiff totaling $44.5 million on June 30, 1976. The only cash required by Newell to enter into these transactions was the amount of the purchase less the amount of the short sale. This initial difference between the two amounts is called "margin" or "cost," hereinafter referred to as "cost."

The reports that Newell submitted to plaintiff recorded "open arbitrage positions" at cost. Plaintiff's internal bookkeepers also recorded Newell's arbitrage positions at cost. While the cost figure accurately reflected the market value of an arbitrage position at the moment the transaction took place, any future changes in the market values of the bonds would not be reflected in the cost figure. Hence, any unrealized losses or gains occurring due to fluctuations in market prices would not be reflected in the cost figures which were reported in the annual financial reports.

Defendant first encountered the Newell investments in the course of preparing plaintiff's 1976 financial statement. The accountants assigned by defendant to prepare plaintiff's 1976 financial statement left in their work papers the following note regarding the Newell investments:

"3) Arbitrage—when Newell determines that there is a temporary fluctuation in the price of a government security in relationship to other government securities he buys or sells long that security and purchase [sic] or sells short another government security at the same time. When the fluctuation is eliminated he reverses his previous purchase and short sale and takes a profit (or loss). These arbitrages are generally for over $1 million dollars [sic] and a small fluctuation (1/32 of 1%) can involve a substantial amount of money. The only money actually invested by the Congregation is for margin [cost] required by the dealers (typically the amount of the purchase less the amount of the short sale). The risk is minimized since only U.S. government securities are traded and the chance of default is small.

At June 30, 1976 the Congregation had open arbitrages aggregating $22.25 million at par value and short positions in the same amount. Since the trades in these securities involve minor fluctuations in price (1/32 or even 1/64 of a point) and there is no source which can tell us market value closer than 1 point ($222,500) it was decided not to gross up the balance sheet to reflect these items at market.

Instead footnote disclosure will be made of the total amounts involved and only the margin [cost] outstanding on these arbitrages will be included in investments.

W. Cornfield
10/4/76"

During the preparation of the 1976 financial report, the partner of defendant in charge of plaintiff's account, Philip Melchert, called plaintiff's assistant treasurer, Brother James Kent, to inquire about the Newell investments. Plaintiff claims Melchert recommended that the Newell investments be recorded at cost. Melchert purportedly explained that cost was approximately equal to market value. Plaintiff claims that Brother James did not understand the Newell investments and that in agreeing that the investments be recorded at cost, Brother James deferred to defendant's expertise.

Defendant denies that Brother James did not understand the Newell investments. Defendant claims that Melchert and Brother James mutually agreed to report the Newell investments at cost, and that Brother James fully understood the import of that decision.

After defendant completed its work at plaintiff's offices in 1976, Melchert met with plaintiff's governing body, the Provincial Council (the Council), to discuss the annual report. The 1976 financial report contained a footnote which specified that Newell's investments were carried at cost rather than market value. Plaintiff claims Melchert explained this footnote by again stating that cost was essentially equal to market value.

By reporting arbitrage transactions at cost, defendant reported the Newell investments at $2,166,322 in the 1976 financial report. The actual market value of the investments on June 30, 1976, the date of the report, was $1,951,520. By reporting the transactions at cost, there was a discrepancy between the market value of the Newell investments and the figure reported by defendant in plaintiff's financial reports for each fiscal year from 1976-79. The amounts of the discrepancies are shown in the following chart:

| Fiscal Year | Figure Reported by Defendant in Report | Actual Market Value at Time of Report | Discrepancy |
|---|---|---|---|
| 1976 | $2,166,322 | $1,951,520 | ($ 214,802) |
| 1977 | 1,795,346 | 1,471,720 | ( 323,626) |
| 1978 | 1,792,748 | 878,638 | ( 1,472,887) |
| 1979 | 2,226,014 | 319,861 | ( 1,347,376) |

Kenneth Witt, an employee of defendant, did the field work for plaintiff's 1980 financial statement. Witt prepared a draft of the 1980 financial statement which defendant sent to plaintiff in September 1980. The 1980 draft reported the Newell accounts at approximately $3.6 million. Because the $3.6 million cost figure did not reflect unrealized losses, the actual market value of

Newell's investments was later shown to have been approximately $1.2 million at the time of the report.

Prior to defendant's submitting to plaintiff a final report for 1980, Melchert contacted Witt and asked him where the $3.6 million reported in the draft financial report was located. Witt was unable to answer the question. Melchert then began an independent investigation of the Newell investments and their values. In October 1980, Melchert contacted Newell and requested information regarding plaintiff's funds. Newell was unable to furnish the material that Melchert requested. Melchert next contacted the securities dealers with whom Newell held accounts on plaintiff's behalf. By January 1981, Melchert had received June 30, 1980, market values for the Newell accounts totaling approximately $1.2 million. When Melchert called Newell with this information, Newell informed him that the $1.2 million figure rather than the $3.6 million cost figure reported in the 1980 draft financial report could be the total market value of Newell's accounts with plaintiff.

On February 11, 1981, a week after Melchert spoke with Newell, Melchert attended a meeting of the Council. Plaintiff claims that Melchert informed the Council that the market value of Newell's accounts was approximately equal to cost; however, recent events had, according to Melchert, caused him to question whether there were unrealized losses. Melchert allegedly offered limited details and promised to investigate the matter further. Defendant contends that Melchert informed the Council he had reason to believe that the market value of the Newell investments was approximately $1.2 million.

Approximately two months after the February 11, 1981, Council meeting, a security dealer made a "margin call" on an account managed by Newell. Newell called plaintiff and requested an additional $500,000 to cover

the margin call. Newell explained that if the dealer closed out plaintiff's accounts, substantial "unrealized losses" could be recognized. At the time of the margin call, plaintiff still had in its possession the draft 1980 financial report in which defendant had reported Newell's account at approximately $3.6 million. Plaintiff had not heard anything further from defendant since the February 11, 1981, Council meeting. After a meeting with Newell during which Newell explained the negative consequences of not meeting the margin call, plaintiff's investment officer recommended to plaintiff that the additional $500,000 be forwarded to Newell. On April 14, 1981, plaintiff transferred the additional sum to Newell.

After plaintiff forwarded the additional funds to Newell, plaintiff received from defendant a letter in which defendant stated that the market value of the Newell accounts on June 30, 1978, was $319,860, and not the $1,792,748 cost figure reported in the 1978 financial report. Defendant offered in the letter to discuss the matter further if plaintiff desired.

Late in April 1981, defendant sent plaintiff a copy of the final 1980 financial report. According to the report, the market value of the Newell accounts on June 30, 1980, totaled $1,286,411. "Note H" to the report stated, in part:

> "Since the Congregation carries investments at market value, the amounts reported previously [for the Newell accounts] have been restated to include unrealized gains and losses as follows:

|  | Previously Reported | Adjustment | As Restated |
|---|---|---|---|
| June 30, 1978 | $1,792,747 | ($1,472,887) | $319,860 |
| June 30, 1979 | 2,226.014 | ( 1,347,376) | 878,638" |

Shortly after plaintiff received the final 1980 financial statement from defendant, it closed its accounts with Newell. The accounts had not only been substan-

tially depleted, but due to a shift in interest rates, several of the security dealers with whom Newell dealt claimed plaintiff owed them additional sums. After plaintiff settled all claims with the security dealers, plaintiff sustained net losses on the Newell accounts in the amount of $3,819,352.

In addition to testimony regarding the actual conduct of the parties, both defendant and plaintiff presented expert testimony concerning the propriety of defendant's recordation of the Newell investments. Plaintiff's witness, Vincent Sparrow, a certified public accountant and partner of Peat, Marwick & Mitchell, testified that defendant's method of recording Newell's investments violated Generally Accepted Accounting Principles (GAAP). Sparrow further stated that the market values of Newell's investments were readily ascertainable from the Wall Street Journal. Defendant called as a witness Leonard Savoie, the chairman of the department of accountancy and a professor at the University of Notre Dame. Savoie testified that the footnote disclosures contained in plaintiff's reports were clear in explaining that Newell's investments were not carried at market value. Savoie further testified that this type of footnote disclosure and recordation was in accordance with GAAP.

Prior to filing the complaint here, plaintiff filed a complaint in Federal court against Newell and four securities dealers alleging Federal security law violations. The dealers counterclaimed for amounts due after the liquidation of plaintiff's accounts. In May 1982, plaintiff amended its Federal complaint to join Touche Ross as a defendant, claiming that Touche Ross aided and abetted the security law violations. Plaintiff also asserted State law claims against Touche Ross. In September 1984, the district court granted the defendants' motion for summary judgment on the security law claims and the

aiding and abetting claim. The court declined to exercise pendent jurisdiction over plaintiff's State law claims against Touche Ross, and dismissed those claims without prejudice. Plaintiff appealed the district court's decision, and the Seventh Circuit Court of Appeals affirmed. *Congregation of Passion, Holy Cross Province v. Kidder Peabody & Co.* (7th Cir. 1986), 800 F.2d 177.

After the adverse ruling in Federal district court, plaintiff filed the instant action in the circuit court of Cook County. Plaintiff's complaint consisted of three counts. The first count alleged that defendant was guilty of professional negligence in the manner in which the Newell investments were reported in plaintiff's financial statements. The second count alleged that defendant breached a fiduciary duty it owed to plaintiff by not properly investigating plaintiff's investments and by failing to take appropriate action after it learned of errors contained in the financial statements. The final count alleged that defendant breached its contract with plaintiff by failing to report certain investments in plaintiff's financial statements at market value.

Prior to trial, defendant presented motions to dismiss and for summary judgment. The motions alleged that plaintiff's claims were barred by collateral estoppel because of the findings in the prior Federal litigation, and that the negligence count of plaintiff's complaint was barred by the economic loss doctrine expressed in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69. The trial court denied these motions.

After plaintiff presented its evidence and rested its case, defendant moved for a directed verdict on all three counts of plaintiff's complaint. The circuit court denied defendant's motion as to each of the three counts.

At the close of all evidence, defendant renewed its motion for a directed verdict on all three counts of

plaintiff's complaint. The circuit court denied the motion as to the negligence and breach of contract counts, but granted the motion as to the fiduciary duty count.

In its proofs and closing argument, plaintiff sought total damages in the amount of $3,819,352. The jury returned verdicts in favor of plaintiff for $3.9 million on the negligence count and $1.5 million on the breach of contract count. The jury found plaintiff not guilty of any contributory negligence. Because neither the $3.9 million nor the $1.5 million verdict accurately reflected damages sustained by plaintiff, the trial court ordered a remittitur to $3,819,352 on the negligence count and to $0 on the breach of contract count. Plaintiff agreed to the remittitur on the negligence count, but refused to consent to remittitur on the breach of contract count. The trial judge entered what he called a "judgment of liability" on both counts and entered an award of damages in the amount of $3,819,352 on the negligence count only.

The appellate court affirmed the judgment of the trial court on the condition that plaintiff agree to a remittitur of the contract claim to $0. (224 Ill. App. 3d 559.) If plaintiff refused to consent to the remittitur, the case was to be remanded to the trial court on the question of damages. Plaintiff consented to the remittitur. We allowed defendant's petition for leave to appeal to this court. 134 Ill. 2d R. 315.

Defendant alleges here several points of error which it claims are grounds for reversal. First, defendant claims plaintiff was collaterally estopped from contesting issues that were necessary to the result in the parties' prior Federal litigation. Defendant claims that several findings of fact necessary to the result in the Federal litigation were inconsistent with defendant's liability in the present case.

Defendant further claims that the lower court

judgment awarding damages for purely economic losses in tort is contrary to *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69. Defendant further contends that the appellate court erred in applying the negligent misrepresentation exception to the economic loss doctrine in affirming the trial court.

Finally, defendant claims that the trial court erred in a number of pretrial and evidentiary rulings. Defendant also alleges that because the verdicts did not conform to the evidence, the trial court should have set aside the verdicts.

Plaintiff contends that the judgments below are correct and should be upheld. In the event, however, that this court should determine that further proceedings are required, plaintiff requests the following cross-relief: (1) that the breach of contract verdict be amended to allow full recovery on the contract count; (2) that plaintiff's consent to remittitur on the breach of contract count be rescinded; and (3) that the directed verdict entered in favor of defendant on plaintiff's breach of fiduciary duty count be reversed.

## DISCUSSION

### I. Collateral Estoppel

In 1981, plaintiff brought suit in Federal district court against its former investment advisor, Cranford D. Newell, and several securities dealers alleging security law violations. Plaintiff later added Touche Ross as a defendant, alleging Touche Ross aided and abetted the security law violations. Plaintiff also alleged State law claims against Touche Ross. Defendants filed a motion for summary judgment, and the Federal district court granted the motion on the security law claims and the aiding and abetting claim. The court, however, declined to exercise pendent jurisdiction over plaintiff's State law claims, and dismissed those claims without preju-

dice. Plaintiff appealed the district court's grant of summary judgment on the security law claims and the aiding and abetting claim, and the United States Court of Appeals for the Seventh Circuit affirmed. *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.* (7th Cir. 1986), 800 F.2d 177.

Defendant argues that the doctrine of collateral estoppel precludes plaintiff from relitigating those issues decided in the Federal adjudication. Defendant alleges that plaintiff advanced contentions in the present case which directly contradicted the Federal court findings. Plaintiff, on the other hand, claims that those questions decided during the Federal adjudication are not relevant to the present case.

The appellate court believed that because no determination on the merits of the pendent State claims was made by the Federal court, collateral estoppel could not apply. We agree that collateral estoppel does not preclude plaintiff's claims here, but for reasons different from those advanced by the appellate court.

Three factors are necessary for the application of collateral estoppel: (1) the issue decided in the prior adjudication must be identical with the one presented in the case in question; (2) there must have been a final judgment on the merits; and (3) the party against whom the estoppel is asserted must be a party, or in privity with a party, to the prior adjudication. *Ballweg v. City of Springfield* (1986), 114 Ill. 2d 107, 113.

While the Federal court's dismissal of plaintiff's State law claims against defendant was not a final judgment on the merits, collateral estoppel could apply to findings made by the Federal courts while ruling on the security law claims. Plaintiff was a party to the Federal litigation, and there was a final judgment on the merits regarding the security law claims. "Summary judgment *** is the procedural equivalent of a trial

and is an adjudication of the claim on the merits." (*Poulos v. Reda* (1987), 165 Ill. App. 3d 793, 801.) Plaintiff, therefore, is precluded from relitigating any findings that were made during the Federal court's adjudication of the security law claims.

Defendant claims that the following findings of fact were made during the Federal adjudication: (1) Newell was plaintiff's agent; (2) Newell had total discretion to act as plaintiff's agent in executing arbitrage transactions; (3) Touche Ross made no misrepresentations to plaintiff; (4) plaintiff was fully aware of the Newell transactions and the type of risks they involved; (5) Newell acted within his authority; (6) plaintiff relied only on Newell and plaintiff's business advisory board in making investment decisions; (7) plaintiff was able to and did follow the Newell transactions; (8) plaintiff and defendant agreed to report the Newell investments on a cost, not market, basis; and (9) plaintiff was responsible for the losses incurred.

Several of the findings defendant relies on in its collateral estoppel claim are not relevant to plaintiff's theories of recovery here. Accordingly, these findings could have no effect on the judgment rendered in this case. That Newell was plaintiff's agent, that Newell had discretion to invest plaintiff's funds and acted within his authority, that plaintiff was aware of the risks involved in Newell's investments strategy, or that plaintiff relied only on Newell and its own business advisory board in making plaintiff's investment decisions have no bearing on whether defendant is liable to plaintiff for the manner in which defendant recorded the Newell investments in plaintiff's financial report.

We do not believe that the remaining points urged by defendant as findings were actually decided in the Federal adjudication. The doctrine of collateral estoppel applies only to controlling facts or questions material to

the determination of both causes. (*Housing Authority v. Young Men's Christian Association* (1984), 101 Ill. 2d 246, 252.) As we explain below, none of the remaining points were necessary to the Federal adjudication, and thus collateral estoppel cannot apply.

Whether plaintiff agreed with defendant to report Newell's investments at cost in plaintiff's financial reports was not necessary to the Federal adjudication. The Federal security law claims were based on alleged misrepresentations by Newell and the securities dealers. Defendant was accused of aiding and abetting the security law violations. Once the Federal court determined, however, that no misrepresentations were made by the securities dealers to plaintiff, communications between plaintiff and defendant became irrelevant to the Federal claim. The Federal courts found that defendant could not be guilty of aiding and abetting if no primary violation of the security laws had been established. Any agreement between the plaintiff and defendant, therefore, was not necessary to the Federal adjudication. For the same reason, any misrepresentations by defendant to plaintiff were not relevant to the Federal claims.

Defendant further alleges that the Federal courts found plaintiff was able to track the Newell investments. In its opinion, however, the Seventh Circuit stated that plaintiff's ability to track the Newell investments was not necessary to its decision. (*Congregation of the Passion*, 800 F.2d at 182 n.4.) As we have stated, *Housing Authority* holds that collateral estoppel will not attach to this type of finding.

Regarding this point, the dissenting justice asserts the Federal district court found that plaintiff was able to "track" Newell's investments. The quotation contained in the dissent appears in the transcript of the April 30, 1985, hearing at which the district court granted the securities dealers' motions for summary

judgment on counterclaims they had brought against the Congregation to collect sums they were owed as a result of Newell's transactions. In opposition to the motions, the Congregation argued that Newell and the dealers had engaged in unauthorized transactions using funds lent by the dealers to Newell. The judge rejected the Congregation's theory, determining that the Congregation was aware of, or could "track," each one of Newell's investments as it was made, that the funds invested by Newell belonged to the Congregation, and that Newell was acting within the scope of his authority in making those investment decisions. With respect to the Congregation's awareness of Newell's activities, the district judge stated at the April 1985 hearing:

> "Simply put, Newell had broad discretion and the plaintiff had knowledge of his activities which it cannot deny. During the years 1975 through 1981, plaintiff was able to track the investments through confirmation slips and accurate reports of the transactions which the dealers supplied. Plaintiff received the statements of its United California Bank account and also had before it those statements, the cash sheets and the ticket numbers assigned by Newell for each transaction. The cash transfers were not going into the agent's hands while the principal remained unaware.
>
> In this case, the funds in question were flowing in and out of the plaintiff's own bank account. Therefore, plaintiff was not without knowledge of Newell's transactions during this period of further losses. The documents and the transactions were complex, confusing and ultimately unwise, but the plaintiff had the ability to follow them and to have review of them for themselves or by another specialist other than Newell."

Examination of the district court's entire statement shows that the judge, in speaking of the plaintiff's ability to "track" the investments, was referring only to the plaintiff's knowledge of the particular transactions Newell was entering into on plaintiff's behalf—not that the plaintiff knew the actual extent of Newell's investment

losses. As stated earlier in this opinion, both Newell and the securities dealers sent plaintiff confirmation slips accurately detailing all of Newell's transactions. Of course, the confirmation slips showed only the value of the investments when they were made. Future fluctuations in market price were not reported to plaintiff by Newell or the securities dealers. Instead, plaintiff retained defendant to value Newell's investments. The district judge acknowledged that plaintiff could obtain review of Newell's investments by an outside specialist, and it is the asserted negligence of the outside specialist retained for that purpose—defendant, Touche Ross—that is at issue here. In sum, we do not believe that the negligence verdict against defendant in the present case is inconsistent with the statement of the Federal district court regarding plaintiff's ability to "track" Newell's investments.

Finally, defendant points to a statement in the Seventh Circuit opinion that the Congregation must be "responsible for the deficit created when [Newell's] investments lost money." (*Congregation of the Passion*, 800 F.2d at 184.) While this statement may be true when applied to third parties dealing with plaintiff through Newell, it is clearly taken out of context when applied to plaintiff's relationship with defendant. We do not construe this statement as expressing a view on whether plaintiff could recover from defendant for defendant's independent breach of contract or negligent acts.

We do not believe that any of the issues urged by defendant in support of its collateral estoppel claim are relevant to the present case. The doctrine of collateral estoppel, therefore, does not bar plaintiff's claim here.

## II. Economic Loss Doctrine

In count I of its amended complaint, plaintiff alleged defendant owed it a common law duty of due care in the preparation of plaintiff's financial reports. Defendant al-

legedly breached this duty by reporting the Newell investments at their initial cost rather than at market value at the time of the annual financial reports, and by misstating to plaintiff that the cost of the Newell investments was a reliable indicator of the market value of the investments. In 1978, for example, the Newell investments were reported at their $1,792,747 cost figure rather than their $319,860 market value at the date of the report. Plaintiff claims that defendant's negligence in reporting these values caused it to maintain its accounts with Newell longer than it otherwise would have had it known the market value of the Newell investments. Newell eventually lost $800,000 of the funds he managed for plaintiff, and incurred additional liability of approximately $3 million on plaintiff's behalf.

Count I of plaintiff's amended complaint sought recovery in tort for the depletion of the funds in Newell's control as well as the additional liability incurred by Newell on plaintiff's behalf. Defendant claims that damages alleged by plaintiff in count I of its complaint constitute economic damages and are not recoverable in tort. The issue before us, therefore, is whether the economic loss doctrine bars recovery in tort for accountant malpractice. We find that it does not.

The economic loss doctrine found its roots in *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17, authored by Justice Traynor. In *Seely*, plaintiff purchased a truck manufactured by defendant. Shortly after the purchase, plaintiff noticed that the truck bounced violently. Despite his efforts, plaintiff was unable to get the problem fixed. Approximately 11 months later, while plaintiff was driving it, the truck overturned. The truck was damaged but plaintiff was not physically injured. After plaintiff repaired the truck, he stopped making payments on the truck. The seller

then repossessed the truck, and plaintiff sued defendant on the theories of breach of express warranty and strict liability in tort. Defendant sought damages for the repair of the truck, for money paid on the purchase price and for profits lost by virtue of the truck's unsuitability for normal use. Regarding plaintiff's damages for money paid on the truck's purchase price and for profits lost by virtue of the truck's unsuitability for normal use, the court stated that these economic losses were not recoverable under strict liability in tort. (*Seely*, 63 Cal. 2d at 18, 403 P.2d at 151-52, 45 Cal. Rptr. at 23.) The court explained that products liability grew from the public policy judgment that persons who are injured by dangerous products need more protection than that afforded by the law of warranty. (*Seely*, 63 Cal. 2d at 15, 403 P.2d at 149, 45 Cal. Rptr. at 21.) The *Seely* court believed that if the products liability tort theory were allowed to progress without limitation, however, tort law would wholly engulf contract law. In order to preserve a proper role for the law of warranty and to allow the parties to bargain for the terms of their agreements, the court precluded tort liability in those situations where a defective product caused purely economic losses. (*Seely*, 63 Cal. 2d at 15-16, 403 P.2d at 150, 45 Cal. Rptr. at 22.) The *Seely* court noted that "[t]he distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss is not arbitrary and does not rest on the 'luck' of one plaintiff in having an accident causing physical injury." (*Seely*, 63 Cal. 2d at 18, 403 P.2d at 151, 45 Cal. Rptr. at 23.) "The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products." *Seely*, 63 Cal. 2d at 18, 403 P.2d at 151, 45 Cal. Rptr. at 23.

This court first addressed the economic loss doctrine

in *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69. In M*oorman*, the plaintiff (Moorman) purchased a grain storage tank from the defendant (National Tank). When a crack developed in the grain storage tank, Moorman sued National Tank for strict liability in tort to recover the cost of repairing the tank and for loss of the tank's use. National Tank argued that Moorman's tort counts were barred because they sought recovery for purely economic loss. The trial court dismissed the tort counts, but the appellate court reversed. In reversing the appellate court and affirming the trial court's dismissal of the tort count, this court noted that the law of sales had been carefully articulated in the Uniform Commercial Code to govern the economic relationship between a seller and buyer. (*Moorman*, 91 Ill. 2d at 78.) The court then stated that application of the rules of warranty to liability prevent a manufacturer from being held liable for damages of unknown and unlimited scope, and that a purchaser is able to allocate the risk of unsatisfactory performance by bargaining for a warranty. (*Moorman*, 91 Ill. 2d at 79.) Accordingly, this court denied Moorman's recovery in tort, stating:

"Tort theory is appropriately suited for personal injury or property damage resulting from a sudden or dangerous occurrence ***. The remedy for economic loss, loss relating to a purchaser's disappointed expectations due to deterioration, internal breakdown or nonaccidental cause, on the other hand, lies in contract." *Moorman*, 91 Ill. 2d at 86.

In *Moorman*, this court adopted the reasoning of *Seely* that tort law would, if allowed to develop unchecked, eventually envelop contract law. Contract law serves a vital commercial function by providing sellers and buyers with the ability to define the terms of their agreements with certainty prior to a transaction. Where the duty of a seller has traditionally been defined by contract, therefore, *Moorman* dictates that the theory of

recovery should be limited to contract although recovery in tort would be available under traditional tort theories.

This court applied the economic loss doctrine in a real estate context in *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171. In *Redarowicz*, the plaintiff alleged that the defendant was responsible for faulty construction of the plaintiff's residence. The defendant builder completed the house in 1976, and the plaintiff purchased the house from the original owner in 1977. Soon after the purchase, the plaintiff discovered that the chimney and adjoining wall were beginning to pull away from the rest of the house. The court stated that "[a] buyer's desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects." (*Redarowicz*, 92 Ill. 2d at 177.) The court found *Redarowicz* analogous to *Moorman*, and affirmed the dismissal of the tort count of the plaintiff's complaint. *Redarowicz*, 92 Ill. 2d at 177.

In *Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146, this court extended the economic loss doctrine to the furnishing of services. Codefendant Ledbetter retained plaintiff, Anderson, to perform electric work on goods manufactured by codefendant C-E Walther, Inc. Pursuant to a contract between Walther and Ledbetter, Walther was required to inspect and approve Anderson's work. Anderson claimed Walther negligently performed the inspection and approval of Anderson's work, and that as a result of that negligence, Anderson was wrongfully required to redo a substantial amount of work. The court held that Anderson was seeking purely economic damages, and that the economic loss doctrine precluded Anderson's recovery in tort. (*Anderson*, 115 Ill. 2d at 153.) The court reached this result even though Anderson did not have a cause of action in contract. "A plaintiff seeking to re-

cover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Anderson*, 115 Ill. 2d at 153.

A provider of services and his client have an important interest in being able to establish the terms of their relationship prior to entering into a final agreement. The policy interest supporting the ability to comprehensively define a relationship in a service contract parallels the policy interest supporting the ability to comprehensively define a relationship in a contract for the sale of goods. It is appropriate, therefore, that *Moorman* should apply to the service industry. Just as a seller's duties are defined by his contract with a buyer, the duties of a provider of services may be defined by the contract he enters into with his client. When this is the case, the economic loss doctrine applies to prevent the recovery of purely economic loss in tort.

In *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, this court employed the economic loss doctrine to deny a client's tort claim against an architecture firm. The plaintiff, Lincoln Park, hired the defendant to design condominium units. Lincoln Park alleged that after the units were completed, the windows and doors were loose, the roof leaked, the garage was settling, and the utilities were inadequate and did not function properly. Lincoln Park brought suit against the defendant on both tort and contract theories. In holding that the economic loss doctrine prohibited Lincoln Park's recovery in tort, this court stated "that the concept of duty is at the heart of distinction drawn by the economic loss rule." (*Lincoln Park*, 136 Ill. 2d at 314.) Because the defendant architect's responsibility originated in its contract, the court found its duties should be measured accordingly. In *dicta*, the court noted that

*Lincoln Park* should not be interpreted to stand for the end of all recovery for malpractice in tort. As an example, the court noted that, historically, legal malpractice claims had gone forward in tort because Illinois courts had found that attorneys owe an extracontractual duty which arises not from contract, but from the traditional responsibilities a lawyer owes to a client. *Lincoln Park*, 136 Ill. 2d at 318.

In *Collins v. Reynard* (1992), 154 Ill. 2d 48, this court squarely addressed the issue of whether the economic loss doctrine applies to attorney malpractice. This court held that a complaint against a lawyer for professional malpractice may be couched in either contract or tort. The concurring opinion stated that an attorney's duty of competence exists "without regard to the terms of any contract of employment entered into by a lawyer and a client." The concurrence went on to explain that "[t]he cases in which *Moorman* has been applied are grounded on the notion that the complaining party, if he wished protection against the particular type of harm suffered, could have bargained for a guarantee or warranty against it." *Collins*, 154 Ill. 2d at 56 (Miller, C.J., specially concurring, joined by Bilandic, Freeman & Cunningham, JJ.).

The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client. Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty. The present case involves professional malpractice by an accounting firm. The underlying issue is whether the duty an accountant owes to his client is defined by his contractual obligations, or is extracontractual.

While a client contracts with an accountant regard-

ing some general matters, an accountant must make his own decisions regarding many significant matters, and the final decision he makes is not necessarily contingent on the contract he executes with his client. An accountant may offer different levels of service, such as audited or unaudited preparation of financial statements, but within these levels of service, the client is not required or expected to be able to direct the conduct of the accountant through contractual provisions. A client should know that an accountant must make certain decisions independently, and the client has the right to rely on the accountant's knowledge and expertise when those decisions are made by the accountant. This knowledge and expertise cannot be memorialized in contract terms, but are expected independent of the accountant's contractual obligations.

An analogy to the accountant-client relationship can be found in the attorney-client relationship. In both cases, the ultimate result of the relationship between the professional and client is something intangible. Whether the professional produces a legal brief or a financial statement, the value of the services rendered lies in the ideas behind the documents, not in the documents themselves. In contrast to the relationship between an attorney or accountant and their client, the relationship between an architect and his client produces something tangible, such as a plan that results in a structure. The characteristics of a tangible object are readily ascertainable, and they can be memorialized in a contract and studied by the parties. The characteristics of something intangible, however, are much more amorphous than the characteristics of something tangible. It is not necessary or generally possible to memorialize all the elements of "competent representation" in a contract. What is necessary to competently represent a client will normally vary with different

situations and cannot be anticipated before performance begins. Further, the law has not traditionally required that these elements be included in the retention contract. Application of the *Moorman* doctrine limiting recovery of purely economic losses to contract, therefore, is inappropriate where a relationship results in something intangible.

"Accountants have long been held to be members of a skilled profession, and liable for their negligent failure to observe reasonable professional competence." (P. Kelly, *An Overview of Accountants' Liability*, 15 Forum 579, 583 (1979).) This duty to observe reasonable professional competence exists independently of any contract. The economic loss doctrine does not bar recovery in tort for the breach of a duty that exists independently of a contract.

Although the question of economic loss was not addressed in *Dail v. Adamson* (1991), 212 Ill. App. 3d 66, the court allowed recovery for accountant malpractice in either tort or contract. (See also *First National Bank v. Brumleve & Dabbs* (1989), 183 Ill. App. 3d 987, 992-93 (tort count for accountant malpractice held to state a valid cause of action).) Tort law has traditionally afforded an avenue of recovery for accountant malpractice, and *Moorman* does not persuade us to reach a different result in the present case. Further, application of the *Moorman* doctrine supports our conclusion allowing recovery in tort for accountant malpractice.

Plaintiff alleges that defendant committed malpractice by the method it used to record the Newell investments in plaintiff's financial statements. This would be a breach of the extracontractual duty of reasonable professional competence which defendant owed plaintiff. Allowing plaintiff to recover its losses in tort, therefore, is consistent with the economic loss doctrine announced in *Moorman*. In view of this result, we need not consider

defendant's additional contention that plaintiff cannot recover under a negligent misrepresentation theory.

### III. Other Errors Alleged

Defendant summarily alleges the occurrence of a number of other errors that it believes entitles it to a new trial. We have examined defendant's contentions and fail to find any grounds for reversal.

### A. Pretrial Rulings

Prior to trial, plaintiff filed a motion *in limine* attempting to preclude defendant from making any reference to plaintiff's investments other than those investments made by Newell. The trial judge granted the motion over defendant's objection. Defendant contends that plaintiff's other investments show that plaintiff knowingly employed investment advisors who utilized highly speculative investment strategies, and the risk of plaintiff's investment strategy is relevant to whether plaintiff was contributorily negligent in its dealings with Newell. We note that during arguments on the motion *in limine*, defendant contended that plaintiff had a history of retaining investments which were initially unprofitable. Defendant, however, does not pursue that theory here, and we therefore do not address this argument. Plaintiff asserts that its investment strategy bears no relevance to its claims that defendant negligently valued the Newell investments or that defendant breached its contract with plaintiff.

We agree with plaintiff that the trial court properly allowed the motion *in limine*. Plaintiff's claims relate to the manner in which defendant recorded the Newell investments and not to the risks inherent in those investments. We believe, therefore, that the risks involved in plaintiff's other investments had no relevance to plaintiff's claims.

Defendant next alleges that the circuit court commit-

ted reversible error by limiting the scope of *voir dire.* Prior to *voir dire,* defendant proposed that the venire be asked the following questions:

"(1) Is there anyone here who has made a financial contribution to the Roman Catholic Church or to any order or institution of the Roman Catholic Church including hospitals, monasteries or schools?

(2) Have you or any member of your family ever made a financial contribution to the Passionist Fathers?"

The trial judge rejected these questions. The jurors, however, were asked questions concerning membership in, or employment by, any religiously affiliated institution or organization. Prospective jurors were also asked whether they would give more weight to the testimony of persons who belonged to a religious order. Finally, potential jurors were made aware of the identity of the parties and asked if there was any reason they could not be fair and impartial. The appellate court found no error in the trial court's actions regarding *voir dire.*

In support of the trial judge's ruling, plaintiff contends that the proposed *voir dire* questions were improper because they could have caused potential jurors to reveal their religious affiliation. Plaintiff argues that the other questions asked during *voir dire* were sufficient to disclose the venire's prejudices, and that the additional inquiry suggested by defendant was not necessary in this case.

Under our Rule 234 (134 Ill. 2d R. 234) the primary responsibility for initiating and conducting the *voir dire* examination lies with the trial judge, and the scope and extent of the inquiry rests within the discretion of the judge. (*Kingston v. Turner* (1987), 115 Ill. 2d 445, 464.) When a proposed *voir dire* question could uncover religious affiliation, therefore, it is within the trial court's discretion whether to allow the question. Generally, when religious affiliation is relevant to potential prejudice, subjects related to religious affiliation are

proper subjects of inquiry on *voir dire.* See *Casey v. Roman Catholic Archbishop* (1957), 217 Md. 595, 143 A.2d 627.

We believe, however, that the suggested question regarding contributions to the Catholic Church was too remote from plaintiff's losses to be a proper subject for *voir dire* in this case. Any relationship between a potential juror's contribution to the Catholic Church and plaintiff's losses would be indirect. The trial judge did not abuse his discretion in refusing to ask defendant's first question.

With regard to defendant's second proposed question, concerning contributions to plaintiff itself, defendant argues that a juror might be biased if the juror believed that a portion of the money lost had been contributed to plaintiff by the juror or a member of the juror's family. We agree. Where a juror's contributions to plaintiff could have been included in the funds at issue in the case, the juror's impartiality might be questioned. We believe that the better procedure would have been for the trial judge to ask the venire whether they had made contributions to the Congregation.

We do not believe, however, that the trial judge's refusal to ask potential jurors about contributions to plaintiff denied defendant its right to a trial before a fair and impartial jury. All potential jurors were made aware of the identity of the parties and asked whether they could be fair and impartial. Potential jurors were also asked whether they were members of, or employed by, any religiously affiliated institution or organization, and whether they would give more weight to the testimony of priests and brothers. Finally, we note that the evidence of defendant's liability was overwhelming. Under these circumstances, we do not believe that the trial judge's failure to ask the second question proposed by defendant warrants reversal.

## B. Evidentiary Rulings

During trial, plaintiff was allowed to introduce, over defendant's objection, evidence that Newell had been declared bankrupt. Defendant argues that Newell's bankruptcy had no bearing on the issues involved in the present case and that this evidence was highly prejudicial.

In support of the trial judge's ruling, plaintiff contends that defendant characterized Newell in both the opening statement and closing argument as having caused plaintiff's losses. Plaintiff claims, therefore, that defendant "opened the door" to evidence of Newell's bankruptcy, so that the jury could be told why Newell was not a defendant at trial.

Our review of the record reveals that defendant did not attempt to hold Newell responsible for plaintiff's losses. We do not believe, therefore, that defendant "opened the door" for plaintiff to introduce evidence of Newell's bankruptcy. The circuit court erred in admitting this evidence, which was not relevant to the present case.

We believe, however, that any error in allowing evidence of Newell's bankruptcy was harmless. Plaintiff did not attempt to foster jury bias by portraying defendant as its last possible avenue of recourse. The trial in the present case lasted nearly four weeks, and the trial transcript consumed more than 5,000 pages. The jury was presented with overwhelming evidence on which to find defendant liable. Given the strength of the evidence presented to the jury on the question of defendant's liability, we do not believe that the admission of this evidence denied defendant a fair trial.

Defendant also contends that the trial court improperly allowed the redaction of plaintiff's financial statements to exclude references to investments not made by Newell. Defendant argues that to avoid jury confusion these documents should have been admitted into evi-

dence in their entirety. The appellate court found that the redaction was proper. We agree.

Defendant cites *Beech Aircraft Corp. v. Rainey* (1988), 488 U.S. 153, 172, 102 L. Ed. 2d 445, 465, 109 S. Ct. 439, 451, in which the Court stated "that when one party has made use of a portion of a document, such that misunderstanding or distortion can be averted only through presentation of another portion, the material required for completeness is *ipso facto* relevant." Defendant has made no showing of how redacting the documents could have confused the jury. The admission of evidence is within the sound discretion of the circuit court, and its ruling should not be reversed absent a clear showing of abuse. (*People v. Ward* (1984), 101 Ill. 2d 443.) We find no error in admitting the redacted documents into evidence.

Finally, defendant argues that plaintiff was improperly allowed during trial to characterize defendant as a large international accounting firm with offices throughout the world. Prior to trial, the trial judge denied defendant's motion *in limine* to exclude any reference to defendant's size. Defendant maintains that the only purpose of identifying it in this manner was to suggest to the jury that defendant had ample resources with which to compensate plaintiff for its losses.

Plaintiff argues that the references to defendant's size did not make reference to defendant's wealth. Plaintiff further claims that it relied on defendant's expertise, in part, because of defendant's size and resources, and that defendant's size was relevant to the question of plaintiff's reliance on defendant's advice and financial reports. We agree.

Plaintiff, as part of its case in chief, asserted that it had relied on defendant to give advice regarding the manner in which Newell's investments were recorded. Plaintiff accepted this advice although its members did

not understand the underlying transactions involved. The reasonableness of plaintiff's reliance could have been considered by the jury in determining whether plaintiff was contributorily negligent. Because plaintiff contends that defendant's size and reputation were the basis of its reliance on defendant, the trial court acted properly in allowing reference to evidence related to this issue.

### C. Jury Verdicts

Defendant alleges that the jury's verdict of $3.9 million on the tort count of plaintiff's complaint was against the manifest weight of the evidence. Specifically, defendant argues that the evidence clearly shows that it was not responsible for the loss of $500,000 entrusted to Newell in April 1981.

Defendant alleges that plaintiff entrusted an additional $500,000 to Newell after plaintiff was fully informed of Newell's losses. It is not contested that plaintiff entrusted an additional $500,000 to Newell in April 1981. There was conflicting testimony, however, concerning whether plaintiff was fully informed of Newell's losses at that time.

Defendant claims that Melchert informed plaintiff of Newell's losses at a meeting of the Council on February 11, 1981. Plaintiff, however, insists that Melchert provided only limited details to the Council at that time, and that Melchert stated he still believed the "cost" of the Newell investments was approximately equal to their market value. Further, it was established at trial that both the letter containing the correct 1978 market values of the Newell investments and the final 1980 financial report were delivered to plaintiff after it had forwarded the additional $500,000 to Newell.

At what point plaintiff became aware of Newell's losses is a question of fact, the determination of which depended heavily on the credibility of the witnesses.

The credibility of witnesses and the weight to be given their testimony are matters for the jury to determine, and unless the jury's determination is manifestly against the weight of the evidence, its verdict will not be disturbed on appeal. (*Albaugh v. Cooley* (1981), 87 Ill. 2d 241, 249-50.) For the reasons mentioned, we do not believe that the inclusion of the additional $500,000 in plaintiff's award of damages was against the manifest weight of the evidence.

Defendant also contends that the jury verdicts returned on the tort and contract counts of plaintiff's complaint were inconsistent and did not conform to the evidence. The jury returned verdicts in favor of plaintiff for $3.9 million on the tort count and $1.5 million on the breach of contract count. Plaintiff's total damages, however, were only $3,819,352. The trial court ordered remittitur to that amount on the tort count, and $0 on the breach of contract count. Plaintiff consented to remittitur on the tort count, but not on the breach of contract count. The trial court then entered a judgment of liability on both counts, and awarded damages of $3,819,352 on the tort count only. Plaintiff agreed to remittitur to $0 on the breach of contract count in the appellate court as a condition for the appellate court's not remanding the cause for a new trial on the issue of damages.

Defendant contends that the verdicts are irreconcilable and should be set aside. Plaintiff alleges that the jury clearly intended to compensate the Congregation in full for its losses, and that the jury's apparent confusion over awarding damages on each separate count does not warrant reversal.

"[A] verdict must be set aside where the amount of the verdict bears no relationship to the loss suffered by the plaintiff." (*Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 148.) Verdicts are to be liberally

construed, however, and may be amended to conform to the pleadings and evidence contained in the record whenever the intention of the jury is clear. (*Churchill*, 73 Ill. 2d at 148.) Although the $3.9 million verdict returned by the jury on the tort count of the complaint is slightly greater than the amount of the losses suffered by plaintiff, we believe that the relatively minor deviation from plaintiff's actual damages shows that the intent of the jury was to award plaintiff the full amount of its damages on the tort count.

The $1.5 million verdict returned by the jury on the contract count does not bear any ascertainable relationship to the loss suffered by plaintiff. Where plaintiff recovered the full amount of its damages on the tort count, however, the amount of damages awarded on the contract count should not affect its recovery. It is well established that a plaintiff may have only one satisfaction for an injury. (*McLane v. Russell* (1989), 131 Ill. 2d 509, 523.) Both the tort and contract counts were based on the same facts and sought recovery for the same injury. Plaintiff, therefore, could not recover under both counts. Plaintiff acknowledges this limitation on recovery of damages and concedes that $3,819,352 is the maximum amount of its allowable recovery.

Because the jury's intent regarding damages on the tort count of plaintiff's complaint is clear, and damages awarded on the contract count could not affect plaintiff's recovery, we do not believe that the conflicting verdicts warrant reversal of this case.

### CONCLUSION

For the reasons given, we affirm the judgment of the appellate court. Accordingly, we need not consider plaintiff's request for cross-relief.

*Affirmed.*

JUSTICE NICKELS took no part in the consideration or decision of this case.

JUSTICE FREEMAN, specially concurring:

The majority narrowly holds that the economic loss doctrine does not bar a tort claim for accountant malpractice. I agree with the result. The majority reaches this result by concluding that a contract for accountant services, like that for attorney services, has some extra-contractual duties, which are not capable of memorialization. The presence of these duties, reasons the majority, distinguishes accountants and attorneys from other professionals, such as architects, where the professional's obligations may be memorialized in the contract. The rule which the majority here espouses is that "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." (159 Ill. 2d at 162.) That being the case, an accountant, like an attorney, may be liable in tort for the failure to competently perform his extracontractual duties.

I agree that the extracontractual-duties analysis provides a proper rationale for the holding in this case. This same rationale was offered in the concurring opinion in *Collins v. Reynard* (1992), 154 Ill. 2d 48, 52 (Miller, C.J., concurring), with respect to tort claims for attorney malpractice. I write separately, however, because this rationale appears to me to have broader implications than the majority suggests.

A professional is one with specialized skill and expertise. In any agreement for professional service, there is an unwritten expectation that the professional will perform competently. And, the failure to exercise a reasonable degree of professional care and skill constitutes malpractice. (159 Ill. 2d at 164.) These general propositions hold true regardless of the nature of the profession or that a tangible product results from the professional-client relationship. To the extent that extracontractual duties are defined as the expectation of

"reasonable professional competence," such duties are present and are implicit in every professional-client contract. Acceptance of the extracontractual-duties rationale clears the way for tort claims in professional malpractice cases in general.

The majority, having concluded that the nature of the recovery here is dictated by the existence of extracontractual duties, is confronted with *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, an architect malpractice case. In *Lincoln Park*, this court barred the plaintiff's recovery in tort for architectural malpractice, finding that the plaintiff's recovery was confined to contract damages. The majority apparently recognizes that the extracontractual analysis creates an unnatural tension between this case and *Lincoln Park*. To reconcile the two cases, the majority attempts to distinguish *Lincoln Park*, by adding another layer to the professional malpractice analysis. The majority holds that because something tangible resulted from the architect-client relationship, the plaintiff was only entitled to contract damages.

Because I believe that the architect in *Lincoln Park* owed the client the extracontractual duty to design the structure competently, I disagree that the majority's tangible/intangible distinction makes any difference. Even had no structure resulted from the relationship, the extracontractual expectation of competent performance was present, and under the analysis applied in this case, the plaintiff's cause of action could lie either in tort or contract. In my view, *Lincoln Park* is irreconcilable with this case, and to the extent that its holding is inconsistent with the holding here, it should be expressly overruled.

By failing to simply conclude that architects, like any other professional, owe their clients extracontrac-

tual duties, the majority has effectively created the need for a case-by-case determination of which professionals owe such duties. Further, considering that a product resulting from the professional-client relationship may be only incidental to the relationship, the majority's tangible/intangible distinction is tenuous at best. Under the majority's analysis, no matter how incidental the tangible end product is to the service provided, the existence of such a product will serve to bar a tort claim for malpractice. In my view, it is sufficient to say that in the context of a professional malpractice claim, where the duty to perform extracontractual obligations competently has been breached, the professional may be liable in tort.

JUSTICE HEIPLE, dissenting:

I dissent from the majority opinion for three reasons. First, several material issues were decided in the Federal litigation which should have precluded their relitigation in State court. Second, the inconsistent jury verdicts cannot be glossed over. Finally, today's opinion fails to provide guidance in an unnecessarily murky area of law. Once again, this court has plunged into the quagmire known as the *Moorman* doctrine and dredged up yet another ill-conceived exception to add to the current confusion.

Standing alone, the earlier Federal litigation, giving rise to estoppel, should have resulted in a judgment for the defendant. Even if estoppel were not applied, the defendant deserves a new trial as a result of the inconsistent verdicts. Finally, the majority opinion is incoherent in its discussion of the *Moorman* doctrine. The majority opinion has further muddled rather than clarified *Moorman*.

## FACTS

In 1975, plaintiff, the Congregation, created a

"retirement fund" for its members initially valued at $1 million. In 1976, the Congregation established a "permanent fund" also valued at $1 million. The purpose of the permanent fund was to provide for the ongoing needs of the religious and lay personnel who assisted the Congregation. Plaintiff's Business Advisory Board (BAB), a lay advisory board of businessmen, accountants, and experienced securities and commodities traders provided investment and general business advice to the plaintiff.

In the course of developing an investment strategy, the Congregation retained Cranford D. Newell Associates (Newell) as its investment manager. By written agreement, the Congregation's retirement and permanent funds were committed to Newell's full discretionary authority.

In order to meet the Congregation's high return expectations of 12% to 15%, Newell engaged in arbitrage transactions in government securities. These arbitrage investments were first made in the 1976 fiscal year.

Arbitrage is the buying of stocks, or in this case, government securities having different maturity dates and interest rates in one market and simultaneously selling them in another market, in order to profit from a price discrepancy. Trades frequently involve more than $1 million and even minor fluctuations ($1/32$ or $1/64$ of a point) can mean large sums of money. It is an investment strategy that entails great risks. In other words, arbitrage is a fancy name for big time gambling.

Newell's trading strategy was highly leveraged in that the only cash required to establish an arbitrage position was the difference between the amount obtained from the sale and what was needed to pay for the buy. The reports that Newell submitted to the Congregation reflected the open arbitrage positions at what Newell

called "margin," in other words, net cash paid, not at the market value of the securities.

The Congregation engaged Touche Ross to perform unaudited reviews of the Congregation's financial statements for the fiscal years 1974 through 1980. The Congregation engaged Touche Ross prior to turning over its funds to Newell, and Touche Ross was not specifically engaged to consult with plaintiff regarding the arbitrage transactions.

Each year through 1979 Touche Ross sent the Congregation an engagement letter, accepted by the plaintiff, which described the anticipated services that Touche Ross would provide to the Congregation. This form of letter was drafted before Newell's arbitrage trading began.

Unbeknown to Touche Ross, there were mounting problems with the arbitrage trading accounts managed by Newell in 1976 and 1977. In the fall of 1980, during the Touche Ross review of plaintiff's June 30, 1980, unaudited financial statements, Philip Melchert, the Touche Ross engagement partner, raised a question concerning the assets supporting the $3.6 million year-end balance which Newell had reported to the Congregation. After numerous requests to the plaintiff and Newell for additional information concerning these accounts, Melchert was finally provided with the information he needed in January 1981. The information Melchert received from Newell and the dealers indicated that the market value of the Newell accounts as of June 30, 1980, was $1.2 million, or $2.4 million less than the investment value reported to the plaintiff by Newell. During a conference call on February 4, 1981, involving plaintiff's investment officer, Melchert, and James Hart, a trader on the Chicago Board of Options Exchange and a member of the plaintiff's BAB, Newell confirmed that the market value of these accounts on June 30, 1980,

was $1.2 million and that the impairment in value appeared to be permanent.

On February 11, 1981, at a Provincial Council meeting, Melchert advised members of the Provincial Council of the information he had obtained concerning the June 30, 1980, market value of the Newell managed accounts. Despite this information, the Congregation took no action to eliminate arbitrage trading, to close the accounts, or to transfer the management of these accounts to someone other than Newell. Instead of liquidating the accounts, on or about April 14, 1981, more than two months after the Congregation had been advised that the value of the Newell managed accounts on June 30, 1980, was $2.4 million less than the investment value reported by Newell, plaintiff decided to invest an additional $500,000 as requested by Newell. Only after the first week in May 1981, when the equity in the Newell accounts had been completely depleted and substantial debts to certain dealers had been incurred, did the plaintiff act to close its accounts.

In June 1981, the Congregation sued its agent, Newell, and four government securities dealers in the United States District Court for the Northern District of Illinois, alleging Federal securities law violations. The dealers counterclaimed for amounts allegedly owed after liquidation of the Congregation's accounts managed by Newell. In May 1982, plaintiff amended its Federal complaint to join Touche Ross as an additional defendant, charging it with aiding and abetting the dealers and Newell's alleged securities law violations and with breach of fiduciary duty and breach of contract.

In September 1984, the district court granted the defendants' motions for summary judgment, holding that neither Newell nor the dealers had violated the securities laws and that Touche Ross had not aided and abetted Newell or the dealers. The remaining counts were dismissed for want of Federal jurisdiction.

In rendering its decision, the district court made specific findings that (1) Newell was plaintiff's agent acting within the scope of his authority, (2) the plaintiff was able to "track" and understand the Newell transactions and (3) the plaintiff's "reliance was on Newell." Specifically, Judge Charles P. Kocoras stated:

"Simply put, Newell had broad discretion and the plaintiff had knowledge of his activities which it cannot deny. During the years 1975 through 1981, plaintiff was able to track the investments through confirmation slips and accurate reports of the transactions which the dealers supplied. Plaintiff received the statements of its United California Bank account and also had before it those statements, the cash sheets and the ticket numbers assigned by Newell for each transaction. The cash transfers were not going into the agent's hands while the principal remained unaware.

\* \* \*

The documents and the transactions were complex, confusing and ultimately unwise, but the plaintiff had the ability to follow them and to have review of them for themselves or by another specialist other than Newell." *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.* (N.D. Ill. April 30, 1985), No. 81—C—3159 (transcript of proceedings).

The Seventh Circuit Court of Appeals affirmed. (*Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.* (7th Cir. 1986), 800 F.2d 177, 184.) That court concluded that "[t]he record on summary judgment \*\*\* establishes, as a matter of law, that the Congregation authorized and was aware of the type of transactions which created the debts in the accounts maintained with the dealers."

After the adverse ruling in Federal district court, the plaintiff refiled its complaint against Touche Ross in the circuit court of Cook County. The complaint was based upon the same facts and transactions as were the subject of the Congregation's Federal lawsuit.

Plaintiff's complaint consisted of three counts. Count

I, a professional malpractice-negligence count, alleged, in essence, that defendant, *inter alia*, negligently "failed to report and describe accurately the market value of the Newell investments." Count II alleged that defendant breached its fiduciary duty to the Congregation in "failing to report and describe accurately the market value of the Newell investments." Count III, a breach of contract count, alleged that Touche Ross breached its express and implied contractual obligations to plaintiff by "failing to report and describe accurately the market value of the Newell investments." In other words, while there were three legal theories for recovery, the underlying allegations were identical.

Before trial, Touche Ross presented motions to dismiss and for summary judgment which contended that the Congregation's claims were barred by collateral estoppel and that the negligence count was barred by the *Moorman* doctrine. These motions were denied.

After plaintiff presented its evidence and rested its case, defendant moved for a directed verdict on all three counts of plaintiff's complaint. The circuit court denied defendant's motion as to each of the three counts.

At the close of all evidence, defendant renewed its motion for a directed verdict on all three counts of plaintiff's complaint. The circuit court denied the motion as to the negligence (count I) and breach of contract (count III) counts, but granted the motion as to the fiduciary duty count (count II).

In its proof and closing argument, the plaintiff sought total damages of exactly $3,819,352. These damages consisted of $3,293,350.41 in amounts paid to the dealers in satisfaction of their claims against plaintiff and (b) $526,001.59 in other losses. These damages included the $500,000 invested by the Congregation after the February 11, 1980, meeting in which Newell's losses were fully disclosed.

The jury returned separate and inconsistent verdicts for plaintiff in the amount of $3.9 million on count I, the negligence count, and $1.5 million on count III, the breach of contract count. The jury reached this result despite the fact that both the tort and the contract counts were based on the same facts and alleged the identical failures on the part of the defendant.

The trial court ordered a remittitur to $3,819,352 on count I and to $0 on count III. The Congregation agreed to the remittitur on count I, but refused to consent to a remittitur on count III. The trial court then entered a "judgment" of liability on both verdicts, ignored the $1.5 million verdict on count III, and entered a "final judgment," in tort alone, of $3,819,352.

The appellate court affirmed the judgment of the trial court on the condition that plaintiff agree to a remittitur of count III, the contract claim to $0.

## APPEAL TO THIS COURT

On appeal to this court, defendant argues that the doctrine of collateral estoppel precludes plaintiff from relitigating those issues decided in the Federal adjudication. Defendant claims that the Federal courts fully considered and decided: (1) that Newell was plaintiff's agent; (2) that because Newell had total discretion to act as the Congregation's agent in executing its arbitrage transactions and because plaintiff was aware of each transaction at the time of its execution, the Congregation was liable on the counterclaims of the dealers; (3) that defendants made no misrepresentations to plaintiff; (4) that the plaintiff was fully aware of the transactions and the type of risks involved; (5) that Newell acted within the scope of his authority; (6) that the Congregation relied only on Newell and its own advisory board in making its investment decisions; (7) that the Congregation was able to and did track the Newell arbitrage investments and was aware "as a matter of law" of the

transactions in which Newell was engaged; (8) that the Congregation and Touche Ross agreed to report the arbitrage investments on a cost, not market, basis and Touche Ross included a footnote in the financial statements reflecting that agreement; and (9) that the Congregation itself, rather than Touche Ross or the dealers, was responsible for, and the cause of, the losses incurred. Touche Ross argues that the trial court's failure to give effect to the Federal court findings allowed plaintiff to advance contentions directly contrary to those findings—leading to the adverse judgment.

Without discussion, the majority states that the several findings that Touche Ross relies upon for its collateral estoppel claim are not relevant to plaintiff's theory of recovery. Therefore, these findings could not have affected the judgment rendered in this case. Specifically, the majority finds it inconsequential: (1) that Newell was plaintiff's agent, (2) that Newell had discretion to invest plaintiff's funds and acted within his authority, (3) that plaintiff was aware of the risks involved in Newell's investment strategy, and (4) that plaintiff relied only on Newell and its own business advisory board in making plaintiff's investment decision. 159 Ill. 2d at 153.

The majority's finding that none of these issues are relevant to the current theory of recovery is both erroneous and completely conclusory. The plaintiff's theory in this case is that Touche Ross reported the Newell transactions in a negligent fashion, thereby causing plaintiff's losses. As part of this claim, plaintiff must demonstrate that Touche Ross's negligence proximately caused plaintiff's losses. The Federal court finding that plaintiff relied only on Newell and its own business advisory board in making its investment decisions goes directly to the issue of proximate cause. There is no question that Newell and the Board understood

the Newell transactions. If the Congregation relied solely on Newell and the Board for the Congregation's investments, how Touche Ross recorded the Newell transactions is irrelevant because Newell and the Board did not base their investment decision on the Touche Ross year-end reports. Had the trial court given proper weight to the Federal court findings, this case should never have gone to trial.

The majority further finds that the other issues Touche Ross claims to have been litigated previously were not necessary to the Federal court proceedings, thus collateral estoppel does not apply. In particular, the majority finds that the Federal courts did not need to decide whether or not the Congregation could track the Newell investments. (159 Ill. 2d at 154.) For support of this conclusion, the majority cites a footnote in the Seventh Circuit opinion in which that court stated:

> "While it is not necessary to our decision, we note that there is at least some evidence to indicate that the Congregation could follow the transactions. Sister Flaherty testified that she never made an entry on the ledger unless she was satisfied that confirmation tickets agreed with cash reports from the United California Bank. Dep. Tr. at 169-70. In addition, the Congregation's Business Advisory Board and an outside firm carefully examined Mr. Newell's investments." *Congregation of the Passion, Holy Cross Province*, 800 F.2d at 182 n.4.

The majority, however, fails to mention that the Federal district court specifically determined that "the plaintiff had the ability to follow [the transactions] and to have review of them for themselves or by another specialist other than Newell." That court also determined that the "[i]nvestment decisions were made by plaintiff's investment adviser Newell—in whom [the Congregation] had entrusted full discretion—and were tracked by plaintiff's officers and other advisers." *Congregation of the Passion, Holy Cross Province v. Kidder*

*Peabody & Co.* (N.D. Ill. April 30, 1985), No. 81—C—3159 (transcript of proceedings).

The majority offers no reason why it ignored the Federal district court's determinations for collateral estoppel purposes. The mere fact that the Seventh Circuit found the defendants not liable on a different basis than the Federal district court does not expunge the correctness of the district court's finding. The State courts should have barred the relitigation of this issue and dismissed plaintiff's case.

## THE INCONSISTENT JURY VERDICTS

Apart from the collateral estoppel issues, I am also bewildered at the nonchalance with which the majority has trivialized the confused and inconsistent jury verdicts in this case. While it is understandable that a lay jury may be moved by a sympathetic plaintiff, it troubles me greatly to speculate that a majority of this court may have been similarly swayed.

In count I of its complaint, plaintiff claimed that it was injured and that it sustained damages when Touche Ross negligently failed to, *inter alia*:

"(a) report and describe accurately the market value of the Newell investments;

(b) promptly advise [the Congregation] of any material change in the nature and/or balance of such investment ***;

(c) physically inspect or confirm by direct correspondence with independent custodians the Newell investments;

(d) test the market value of the Newell investments by reference to published market quotations;

(e) assure accurate Reports on the nature of the Newell investments; ***."

With respect to the contract count, count III, plaintiff incorporated verbatim the same allegations alleged in the negligence count. Under these circumstances, if plaintiff proved its case, the amount of recovery under either theory should have been the same.

Indeed, plaintiff never claimed that its damages would be different depending on the theory of recovery. Plaintiff claimed the same damages, $3,819,352, for both the negligence malpractice and the contract count.

Nonetheless, the jury managed to return two inconsistent verdicts. The jury awarded plaintiff $3.9 million on the malpractice count, and $1.5 million on the contract count.

These verdicts should have been set aside. It is true that verdicts are to be liberally construed and may be amended to conform to the evidence. (*Churchill v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 127, 148.) In order for a court to amend a jury verdict, however, the intent of the jury must be clear. (*Churchill*, 73 Ill. 2d at 148.) In this case, it is impossible to discern the intent of the jury.

Taken individually, neither verdict is so far removed from the actual loss claimed as to elicit concern. A court could reasonably interpret the $3.9 million malpractice award as the jury's attempt to fully compensate the plaintiff for its entire claim. On the other hand, a court could conclude that the $1.5 million award logically represents the jury's intent to deduct a given amount from plaintiff's claimed losses due to contributory negligence or failure to mitigate damages.

These two verdicts, however, are impossible to justify when taken together. As the majority points out, "[b]oth the tort and contract counts were based on the same facts and sought recovery for the same injury." (159 Ill. 2d at 172.) Rather than remanding for a new trial, however, the majority finds that the jury's intent regarding damages on the tort count is clear, thus the conflicting verdicts do not warrant a reversal.

The fatal error in the majority's opinion stems from its individualized and faulty analysis of the verdicts. The majority first finds that the $3.9 million award

demonstrates that the "intent of the jury was to award plaintiff the full amount of its damages on the tort count." (159 Ill. 2d at 172.) Next, without explanation, the majority finds that the "$1.5 million verdict returned by the jury on the contract count does not bear any ascertainable relationship to the loss suffered by plaintiff." (159 Ill. 2d at 172.) This latter finding, however, completely overlooks the possibility that the jury may have found the plaintiff partly responsible for its losses.

Indeed, the $1.5 million verdict bears no ascertainable relationship to the loss suffered by plaintiff only if the $3.9 million award is viewed as demonstrative of the jury's intent. There is, however, no proof that this is so and the majority does not offer a rationale for its conclusion. It appears that the majority finds that the $3.9 million award bears a truer relationship to the amount lost only because it analyzed that verdict first. Had the majority decided to analyze the $1.5 million award first, perhaps it would have found that the $3.9 million award bears no relationship to the loss. In fact, this would make more sense as the plaintiff asked for $3,819,352, not $3.9 million.

Even if we were to ignore the collateral estoppel problem, given the irreconcilable discrepancy in the verdicts arising from the same facts and issues, I would remand this cause for a new trial on that issue alone.

## MOORMAN DOCTRINE

Finally, I dissent from the majority's disposition of the *Moorman* doctrine issue. With today's opinion, the majority has infused further confusion into an area of law already inundated with uncertainty. Rather than clearly defining the relationship between professional malpractice and *Moorman*, the majority opinion puts litigants and trial judges in a position of having to guess what the exception of the month is. Yesterday it was attorneys. Today, it is accountants but not architects. Tomorrow, who can say?

At the heart of the economic loss doctrine is the proposition that contract law, and not tort law, provides the appropriate set of rules for the recovery of purely economic damages. As originally defined by this court, economic damages were those " 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property.' " (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 82, quoting Note, *Economic Loss is Products Liability Jurisprudence*, 66 Colum. L. Rev. 917, 918 (1966).) The rationale for this tort-contract dichotomy originally stemmed from a reluctance of courts to expose manufacturers to open-ended liability for unforeseeable consequential damages. (See generally Way, Note, *The Problem of Economic Damages: Reconceptualizing the Moorman Doctrine*, 1991 U. Ill. L. Rev. 1169.) Thus, in the *Moorman* case, this court denied recovery in negligence for a defective grain storage tank. This court noted that the Uniform Commercial Code specifically allowed sellers to disclaim warranties for qualitative defects and that to allow for the recovery of such defects in tort law would eviscerate the UCC scheme. *Moorman*, 91 Ill. 2d at 79.

While *Moorman* was decided with products liability and the UCC warranty provisions in mind, this court soon extended the reach of the economic loss doctrine to claims for *services* performed negligently. (*Anderson Electric, Inc. v. Ledbetter Erection Corp.* (1986), 115 Ill. 2d 146.) The subsequent extension of *Moorman* to professional malpractices was then predictable. In *2314 Lincoln Park West Condominium Association v. Mann, Gin, Ebel & Frazier, Ltd.* (1990), 136 Ill. 2d 302, this court took the next step.

In *Lincoln Park*, a condominium association sought damages from the architectural firm of Mann, Gin, Ebel

& Frazier. The association alleged that the architects had negligently designed the condominiums that the association's members had purchased from a third party. This court held that the claim was barred under the economic loss rule. This court found that the association's claim concerned the owner's expectation—a difference of quality—and determined that the architect had no duty in tort to protect the unit owners from that type of loss. *Lincoln Park*, 136 Ill. 2d at 317.

Subsequent to *Lincoln Park*, this court was presented with the question of whether the economic loss rule applied to attorneys, thereby barring malpractice suits in tort for purely economic damages. In *Collins v. Reynard* (1992), 154 Ill. 2d 48, this court created an exception to the general rule and held that a complaint for malpractice may be couched in either contract or tort and that recovery may be sought in the alternative. The opinion, however, stated that this particular ruling was grounded more in historic precedent rather than logic—citing the fact that attorneys have always been sued in tort. The opinion specifically limited the ruling to attorney malpractice cases. *Collins*, 154 Ill. 2d at 52.

The majority now seeks to create a new exception to the economic loss doctrine. While I do not find it overly disturbing that accountants can be sued in tort for purely economic damages, I am concerned by the fact that the majority has adopted a piecemeal approach for determining what services are not protected by *Moorman*.

The majority submits that the doctrine only applies to those service industries where the "duty of the party performing the service is defined by the contract that he executes with his client. Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty." (159 Ill. 2d at 162.) Applied to this case, the ma-

jority contends that the "issue is whether the duty an accountant owes to his client is defined by his contractual obligations, or is extracontractual." (159 Ill. 2d at 162.) The majority suggests that because an accountant's "knowledge and expertise cannot be memorialized in contract terms, but is expected independent of the accountant's contractual obligations," an accountant can be held liable in tort. 159 Ill. 2d at 163.

Having concluded that accountants can be held liable in tort, the majority was still left with the impossible task of distinguishing this case from *Lincoln Park*. That is, why does the *Moorman* doctrine prevent recovery in tort for the professional malpractice of architects, but not the professional malpractice of accountants? The majority offers the suggestion that because the relationship between an architect and his client produces something tangible, the duties of an architect, unlike those of an accountant, can be memorialized in contract. The majority further suggests that, in the case where an intangible product is involved, "[i]t is not necessary or generally possible to memorialize all the elements of 'competent representation' in a contract." (159 Ill. 2d at 163.) This purported explanation, however, is not an aid to understanding.

What are these extracontractual duties? If these duties cannot be articulated in a contract, how is it that the client is able to articulate that they have been breached in a complaint. Why is it that a client cannot require, in the contract, that the accountant exercise the knowledge and expertise of the reasonable certified public accountant? Indeed, it appears that in this case, the parties have done just that. The engagement letter from Touche Ross specifically states:

"We will review the statements of assets and liabilities of the Congregation of the Passion *** and the related statements of support and revenue, expenses, capital additions and changes in fund balances for the years then

ended, *in accordance with standards established by the American Institute of Certified Public Accountants.*" (Emphasis added.)

It should be apparent that the parties have anticipated what would be deemed competent representation, prior to performance.

As for the majority's attempt to distinguish architects from accountants, I submit that the majority has set up the proverbial distinction without a difference. Whether the professional/client relationship creates a tangible or an intangible object is completely irrelevant with reference to whether a professional has competently performed his or her duties. Furthermore, to the extent an architect/client relationship can be memorialized with a general catchall clause requiring competent performance, so can an accountant/client relationship. I am not suggesting, however, that the plaintiff in this case should be barred from suing the accountants in tort. On the contrary, I feel that this court should take this opportunity to reevaluate the application of *Moorman* and remove its protection for all types of professional services, rather than engage in a case-by-case determination of whether a given profession owes some undefinable extracontractual duty to clients or not.

In mapping the future course of the economic loss doctrine, this court should consider the policy behind it. The purpose behind the doctrine, as embodied in *Moorman*, was to protect manufacturers from unforeseen liabilities. To accomplish that result, jurists determined that when a plaintiff's injury consists of disappointed expectations in a product, contract law and not tort law should apply. Unlike contract law, tort law does not ask whether the full extent of the injury was foreseeable, only whether some injury would occur. Thus, a tort remedy for defeated consumer expectations would expose the manufacturer to open-ended liability from all consequences that follow from a given incident. This open-

ended liability seems particularly unjust in products cases where the purchasers communicated their needs only to dealers or retailers but not to the manufacturer.

This line of analysis, however, does not pertain to professional services. In the professional/client relationship, the professional is aware, or should be aware, of any potential liability. For example, attorneys should be able to comprehend their client's situation to the extent where they recognize their potential liabilities if they perform their services in a negligent fashion. The same could be said of accountants and architects. Thus, if a client asks an architect to design a building with specific characteristics and the architect negligently fails to do so, the architect should not be able to claim that the damages caused by his or her negligence were unforeseeable.

If one agrees that damages in professional malpractice cases are foreseeable, what theory a plaintiff brings a suit under becomes irrelevant. The extent of damages should be the same in tort or contract. This is borne out in the case *sub judice* where the claimed loss for breach of contract is identical to that for accountant malpractice.

One must also keep in mind that a suit in tort does not mean that a plaintiff suing for purely economic or commercial loss has automatically won. The plaintiff still has to establish the elements of a tort. That is, the burden of proving duty, breach of duty, causation, and damages remains a prerequisite to recovery.

Indeed, if the economic loss doctrine were ignored for those cases outside the products liability context, the result in those cases leading up to the present state of the law would have been the same. The difference lies only in the fact that this court would not now have to determine whether a defendant owed a plaintiff an extracontractual duty.

For instance, recall that in *Lincoln Park*, a condominium association brought suit against the architects of the condominium. They alleged that the architects had negligently designed the condominiums that the association members had purchased from a third party, Equity Realty. Plaintiffs sought compensatory damages for repairs that the owners were forced to make.

Rather than analyzing this case in terms of the economic loss doctrine, ask whether defendants owed plaintiffs a duty, whether that duty was breached, and whether that breach was the proximate cause of ascertainable damages. In that case, one would have to conclude that the architects did not owe the association members a duty to protect them from these losses. The scope of the architects' duties cannot be interpreted to include disappointed expectation interests of third parties and subsequent buyers.

While this language may sound hauntingly similar to *Moorman*, it is different in a significant manner. This analysis does not bar recovery for economic damages in tort in all cases—only in those cases where the liability is outside the scope of the duty defendant owes plaintiff. Thus, while architects cannot be held liable for the disappointed expectation of subsequent purchasers, they should be held liable for those of their clients.

Had this court taken this path originally, this court would never have had to engage in its incoherent, indeed, impossible task of determining which professionals owe their clients an extracontractual duty and are thus outside the protection of *Moorman*.

When viewed in this light, there appears to be no reason, other than the improvident extension of the *Moorman* case, to prevent professional malpractice suits for economic damages to go forward in either tort or contract. Extension of *Moorman* into the arena of professional malpractice should be written off as a failed

experiment and the economic loss doctrine should be reconfined to cases involving products liability.

For all the foregoing reasons, I respectfully dissent from the majority.

JUSTICE HARRISON joins in this dissent.