**In re BEN FRANKLIN RETAIL STORES, INC., et al.**

**Jay A. STEINBERG, et al., Plaintiffs,**

**v.**

**Robert A. KENDIG, David Brainard, Abbey J. Butler, Melvyn J. Estrin, Harvey A. Fain, Alfred H. Kingon, William A. Lemer and C. Wayne Pyrant, Defendants.**

**Bankruptcy Nos. 96 B 19482, 96 B 19489, 96 B 19493, 96 B 19494, 96 B 19501 and 96 B 19497.**
**Adversary No. 7 A 1339.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Oct. 13, 1998.

Jay Steinberg, Trustee.

Stephen Garcia, Hopkins & Sutter, Chicago, IL, for trustee.

Gerald Saltarelli, Butler, Rubin, Saltarelli & Boyd, Chicago, IL, for Richard Krubeck.

Peter B. Schaeffer, Chicago, IL, for David Brainard.

Peter Robert Sonderby, Davis & Campbell, Chicago, IL, for Curtis Pryant.

Leland Hutchinson, Jr., Freeborn & Peters, Chicago, IL, for Remaining Defendants.

### Memorandum Opinion

RONALD BARLIANT, Bankruptcy Judge.

## INTRODUCTION

Some of the Debtors' unsecured creditors assigned their causes of action against the Debtors' officers and directors to the Chapter 7 Trustee. He, on behalf of the bankruptcy estates and as assignee of those claims, filed this adversary proceeding charging those officers and directors with breach of fiduciary duties and negligence. The Defendants [1] seek to dismiss the Trustee's Second Amended Adversary Complaint on the grounds that (1) the Trustee lacks standing to assert the assigned claims because they are claims solely belonging to the creditors, (2) the directors are shielded from liability by the certificate of incorporation, and (3) the complaint fails to state a claim for relief.[2] This Court now holds that the Trustee has standing to assert the assigned claims, and those claims are not barred by the certificate of incorporation, but his complaint must be dismissed because it fails to state a claim upon which relief may be granted.

---

1. As a matter of convenience and wherever appropriate, the Court will refer to the Defendants collectively although there were three separate motions to dismiss filed. Therefore, even though only one defendant may have asserted a certain argument, it may be attributed to all Defendants for purposes of this Memorandum Opinion.

2. The Defendants also argue that the Trustee lacks standing to bring the claims on behalf of the estate because the Debtors suffered no injury. The Trustee has apparently abandoned his claim to standing apart from as assignee of the creditors' claims. Although he asserts in the complaint and his briefs that he is bringing claims for injuries to the Debtors, he makes no argument in support of independent standing, despite the direct challenge by the defendants. To the contrary, in his main brief he says, "the Trustee is seeking *only* to assert the claims of a number of the largest unsecured creditors of the Ben Franklin Entities which have been assigned to him for the benefit of the Debtor' Estates." Plaintiff's Mem. 7 (emphasis added). The Court will therefore not explore that issue.

## BACKGROUND

The Debtors are all Delaware corporations formerly in the wholesale and retail variety and craft business. They are a holding company (Ben Franklin Retail Stores, Inc.) and its operating subsidiaries that either owned and operated, or franchised and supplied, Ben Franklin and similar stores around the country. The Defendants were the Debtors' officers and directors, except C. Wayne Pyrant, who was an officer, but not a director. They are accused of wrongfully prolonging the Debtors' corporate lives beyond the point of insolvency by misrepresenting the true value of the Debtors' accounts receivable. Specifically, they "refreshed" or redated the due dates of millions of dollars of receivables to make it appear that they were current when, in fact, they were seriously past due. As a result, receivables that should have been written down were recorded at full value. Based on that overvaluation, the Defendants induced creditors to lend money and supply inventory and other value to the Debtors, even after the Debtors were insolvent. Creditors were harmed because the Debtors sank deeper into insolvency as their liabilities grew.

The Debtors filed for chapter 11 bankruptcy relief on July 26, 1996, but the attempted reorganization failed and the Debtors converted their cases to chapter 7 on June 24, 1997. After the conversion, certain unsecured creditors assigned their claims against the Defendants to the Chapter 7 Trustee.[3] The Trustee, as assignee of those claims, alleges that the Defendants are liable for the losses suffered by creditors on two theories. First, the Defendants, as officers and directors of the Debtors while the Debtors were "in the vicinity of insolvency," owed fiduciary duties of care to creditors. The Defendants breached those duties by redating the receivables, misrepresenting the Debtors' financial condition and prolonging the Debtors' corporate lives beyond insolvency. Second, that conduct constituted negligence.

## DISCUSSION

*The Trustee Has Standing to Assert the Assigned Claims of the Unsecured Creditors*

The Defendants argue that the Trustee lacks standing to sue on the assigned claims of the unsecured creditors. They assert that these claims are specific to the unsecured creditors and, as such, the Trustee may not pursue them, notwithstanding the assignments. The Trustee believes that nothing in the bankruptcy code prevents him from bringing these claims and that he has a duty to marshal the Debtors' property for the benefit of the estates.

It is clear that without the assignments the Trustee would not have standing to pursue claims that belong to the creditors.[4] As the

3. The assignments read as follows:

> The Undersigned assignor, for good and valuable consideration, the sum and sufficiency of which is acknowledged by the undersigned assignor, hereby sells, assigns, transfers and sets over and delivers to Jay A. Steinberg, not individually but solely in his capacity as the permanent Chapter 7 trustee (the "Trustee") of Ben Franklin Stores, Inc., Ben Franklin Crafts, Inc., Ben Franklin Transportation, Inc., Ben Franklin Realty Corp. and Ben Franklin Realty Corp. (II) (the "Subsidiary Debtors") and his successor(s), any and all sum or sums of money now due or owing to the undersigned, and all claims, demands, and causes of action of whatsoever kind and nature, that the undersigned has had or now have, or may have against (a) any current or former director, officer or employee of Ben Franklin Retail Stores, Inc. ("Retail") and the Subsidiary Debtors, and (b) the agents, attorneys, accountants and financial advisors of and for Retail and the Subsidiary Debtors, whether jointly or severally, in each case arising out of, or for any loss, injury, or damage sustained by the undersigned. This assignment does not encompass, and should not be construed to include, and claims of the undersigned against Retail or the Subsidiary Debtors for goods sold and services performed.
>
> The undersigned constitutes and appoints the Trustee and his successor(s) as the undersigned's true and lawful attorney-in-fact and attorneys-in-fact, irrevocably, with full power of substitution and revocation, for the undersigned and in the undersigned's name, or otherwise, but for the sole use and benefit of the Trustee and his successor(s) to ask, demand, sue for, collect, receive, compound, and give acquittances for such claim or claims, or any part of such claim or claims.

(Trustee's Second Am. Comp., Ex. A.)

4. As noted above, the Trustee has waived the argument that the estate has its own claim against the Defendants, separate from the creditors' claims.

Seventh Circuit stated in *Steinberg v. Buczynski*, 40 F.3d 890, 893 (7th Cir.1994):

> [T]he Trustee is confined to enforcing entitlements of the corporation. He has no right to enforce entitlements of a creditor. He represents the unsecured creditors of the corporation; and in that sense when he is suing on behalf of the corporation he is really suing on behalf of the creditors of the corporation. But there is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct—not derivative—claim against the third party, which only the creditor himself can enforce.

■ Under Bankruptcy Code § 541(a)(7)[5], however, "[t]he commencement of a case ... creates an estate comprised of [among other property] ... [a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). The assignments effectively turned the unsecured creditors' causes of action into property of the estates and the Trustee has a duty to marshal those assets for the benefit of the estates. *See Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1342–1343 (7th Cir.1987).

The Defendants cite a number of cases to support their arguments that property of the estate is determined as of the commencement of the bankruptcy case, that the assignments cannot confer standing on the Trustee and that the assigned claims are not assets of the estates. The Defendants, however, make no mention of § 541(a)(7). Their vigorous arguments that under § 541(a)(1) property of the estate is determined as of the date of bankruptcy is obviously not pertinent to property acquired under § 541(a)(7), which, by its terms, includes as property of the estate, assets acquired "after the commencement of the case."

Section 541(a) defines the property that comprises the estate in seven subsections. The first one, § 541(a)(1), includes "all legal or equitable interests of the debtor in property *as of the commencement of the case.*" (Emphasis added.) The Defendants' focus on the moment the cases were commenced as if subsection (a)(1) were all there is to § 541. In so doing they duplicate the mistake made by the district court reversed in *In re Wilson*, 694 F.2d 236, 238 (11th Cir.1982):

> We also find that the district court's emphasis on defining the estate as of the date the case was commenced carries little weight, since the general timing restriction of section 541(a) applies to subsections 541(a)(1) and (a)(2) but not to section 541(a)(7). The property of the estate, including property added to the estate after commencement of the proceeding under subsections 541(a)(3) through (a)(7), is "property of the estate".…

The Defendants do cite *Barnes v. Schatzkin*, 215 A.D. 10, 212 N.Y.S. 536 (N.Y.App. Div.1925), *aff'd*, 242 N.Y. 555, 152 N.E. 424 (N.Y.1926), which held that assigned claims could not confer standing on a trustee because the claims were not assets of the debtor prior to the bankruptcy. But the dissent, relying on an opinion by Judge Learned Hand, demonstrated the majority's error: the claims were assigned for the benefit of the estate and the bankruptcy act then in effect contained no provision preventing the trustee from receiving assets for the benefit of the estate.[6] Even if the New York court's majority opinion were otherwise persuasive, the inclusion of § 541(a)(7) in the current bankruptcy code effectively overrules *Barnes*.[7]

---

**5.** Unless noted otherwise, all statutory references are to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

**6.** The dissenter in *Barnes* quoted Judge Hand's 1923 unreported opinion in *Alton v. Breitung* as follows:

> I think ... that the question cannot be raised in this action whether the plaintiff has exceeded his duties as trustee in bankruptcy. No one disputes the validity of the assignment as such; i.e., that the cause of action is assignable. If

so, it passed to the assignee named in the assignment; he became, as we now view such matters, at law as well as in equity, the actual obligee of the cause of action.

215 A.D. at 14, 212 N.Y.S. at 540.

**7.** The Defendants also cite *dicta* in two other precode cases (the bankruptcy code was adopted in 1978). *Hawaiian Investors v. Thorndal (Matter of Petroleum Corp. of America)*, 417 F.2d 929, 934 (8th Cir.1969), relies on *Barnes* and an outdated Collier on Bankruptcy section of which this

*Williams v. California 1st Bank,* 859 F.2d 664 (9th Cir.1988), does involve assignments of claims in a case under the bankruptcy code. In *Williams,* however, the assignments were much different from those upon which the Trustee is relying here. The *Williams* assignments did not provide that the proceeds of any recovery would go to the estate and be distributed to creditors *pro rata,* according to the priories established by the bankruptcy code. Rather, the proceeds, after payment of the trustee and legal fees, were to go to the assigning creditors; non-assigning creditors would get nothing. As the Ninth Circuit correctly characterized the arrangement,

> the assignments notwithstanding, the investors plainly remain the real parties in interest in these actions. The Trustee and the estate will recoup only administrative costs from a favorable judgment; the investor-assignors receive the bulk of any recovery. In reality, then, *the creditors have assigned their claims only for purposes of bringing suit.* As a result, the Trustee, as in *Caplin,* is attempting to "collect money not owed to the estate."

859 F.2d, at 666, quoting and citing *Caplin v. Marine Midland Grace Trust Co. of N.Y.,* 406 U.S. 416, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972).[8] In this case, the estates are the real parties in interest, and any proceeds will come into the estates, to be distributed in accordance with the bankruptcy code.

Finally, in their reply brief, the Defendants take a few weak swipes at the assignments themselves: that the assignments do not clearly transfer the claims to the Debtors' estates; that the assignments reflect that "good and valuable" consideration came from the estate but there was no court approval under § 363 and Bankruptcy Rule 9019; and that the "attorney-in-fact" language suggests that the Trustee may have a conflict of interest between his duties to the estate and his duties to the assignors.

First, the assignments are to "Jay A. Steinberg, not individually but solely in his capacity as the permanent Chapter 7 trustee of the Debtors." A bankruptcy trustee is the "representative of the estate." § 323. His only function is to act for the estate. An assignment to a trustee in that capacity is an assignment to the estate. Second, even assuming the "good and valuable consideration" mentioned in the assignment was property of the estate, it is no business of these Defendants if the Trustee failed to get prior approval under § 363. It is the creditors of the estates, not the Defendants, who have standing to raise that issue. Furthermore, the Defendants have cited no authority, and the Court knows of none, for the proposition that the assignments would be void *ab initio* if § 363 approval were required and not obtained. Third, superfluous boilerplate "attorney-in fact" language does not create a conflict of interests. The assignments appointed the Trustee as "attorney-in-fact ... *for the sole use and benefit of the Trustee* ... to ask, demand, sue for, collect, receive, compound, and give acquittances for such claim...." The Trustee has complete control over the assigned claims and any recovery would go to the estates, to be distributed only in accordance with the distribution priorities contained in the bankruptcy code. Those are the important facts that go to the standing issue, and they cannot be seriously disputed.

For these reasons, the Court holds that the Trustee has standing to pursue the assigned claims for the benefit of the estates he represents.

## The Certificate of Incorporation Does Not Bar this Action

Debtor Ben Franklin Retail Stores, Inc.'s Restated Certificate of Incorporation states in pertinent part:

> *Limited Liability.* A director of the Corporation shall not be personally liable to the Corporation or its stockholders for

Court could find no present counterpart. *Cissell v. American Home Assurance Co.,* 521 F.2d 790, 792 (6th Cir.1975), in turn, relies upon *Hawaiian Investors* for the proposition that a trustee may not sue upon assigned claims. In neither case was the present issue even before the court.

8. There were no assignments in *Caplin.* The Court simply held that the bankruptcy trustee had no standing to assert claims belonging to bond holders. Here, the claims have been assigned to the estate. Under § 541(a)(7), they belong to the estate, not the creditors.

monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware ..., or (iv) for any transaction from which the director derived an improper personal benefit.

 It is correct, as the Defendants argue, that a Delaware statute specifically authorizes provisions such as the one quoted above,[9] and that Delaware courts have recognized and enforced language of the type contained in this provision. It is also true, however, that shareholders' elect directors; creditors do not. Creditors should not be bound by limitations on the scope of the duties of fiduciaries they had no part in selecting because, unlike shareholders, they cannot protect themselves by being careful in their selection of managers.

More broadly, shareholders' investments in corporations are subject to the rights and limitations of the certificate of corporation. Creditors' "investments" are not; they are subject to specific contracts. The Defendants' duties to creditors arose, if at all, to protect the value of those contract claims from diminution by reason of improper conduct. Those duties cannot be reduced by a provision in a certificate that forms no part of the creditors' contracts or the inducement for their "investments." Indeed, the provision itself is limited to "the Corporation or its stockholders." It makes no mention of creditors.

The certificate of incorporation would not shield the Defendants from a chain of breach of or fiduciary duty owed to creditors, if such a claim had been properly alleged.[10]

*The Complaint Fails to State a Claim for Breach of any Fiduciary Duty*

*The basis of the defendants' duty to creditors*

 Delaware law determines the sufficiency of the Trustee's claims.[11] Under Delaware law, directors of solvent corporations owe fiduciary duties to shareholders, but not to creditors. The shareholders, after all, own the corporation and management of the corporate assets is vested in the directors. The directors are therefore entrusted with the control and management of the property of others. As frequently happens when a person is so entrusted with the property of others, the law imposes fiduciary obligations on that person. Creditors, on the other hand, deal with corporations by entering into

---

**9.** 8 Del.Code § 102(b)(7).

**10.** A related issue is whether officers who are not directors owe fiduciary duties to creditors (or, for that matter, shareholders). The parties have cited no cases definitively addressing this point, but fiduciary duty implies a corresponding responsibility. The Delaware statute vests management responsibility in directors, not officers, except to the extent the certificate of incorporation puts it elsewhere. 8 Del.Code § 14(a). No fiduciary duty governing the management of a corporation's affairs can be imposed on persons who have no authority to manage those affairs. In the absence of allegations that an officer has such authority under the certificate of incorporation, that officer has no fiduciary duty. Those allegations have not been made about Pyrant, who was not a director of any Debtor.

**11.** Under the "internal affairs doctrine," this Court must apply the law of the state of incorporation. *See Nagy v. Riblet Products Corp.,* 79 F.3d 572, 576 (7th Cir.1996) ("the liability of corporate investors and directors for intra-corporate affairs almost invariably depends on the law of the place of incorporation") and *Bagdon v. Bridgestone/Firestone, Inc.,* 916 F.2d 379, 382 (7th Cir.1990) (first applying the choice-of-law principles of Illinois, the forum state, and then stating that "Illinois, like other states, uses as its choice-of-law principle in corporate governance the internal affairs doctrine."). The Seventh Circuit suggested in *Matter of Morris,* 30 F.3d 1578, 1582 (7th Cir.1994), that, according to some authorities, a bankruptcy court, sitting in federal question jurisdiction, "need not 'apply the choice of law rules of the forum state in which it sits ... [but rather] may exercise its independent judgment and choose whatever substantive law it deems appropriate in the context of the case before it ....'" (quoting *Woods–Tucker Leasing Corp. v. Hutcheson–Ingram Development Co.,* 642 F.2d 744, 748 (5th Cir.1981) (alterations original)). Under that approach, too, Delaware substantive law should apply to claims that officers and directors of Delaware corporations breached their fiduciary duties. Otherwise officers and directors could have no certainty about their duties.

contracts.[12] Satisfaction of their claims against the corporate assets requires only compliance with their contracts. So long as the corporation is solvent, they require no additional protection; by definition, a solvent corporation, no matter how badly managed otherwise, is able to satisfy its contractual obligations.

In economic terms, this rule of "managerial allegiance [to shareholders] is justified by the status of shareholders as the residual claimants on the corporation's cash flow. So long as the corporation is solvent, business decisions made by managers directly affect the income of the shareholders." Christopher W. Frost, *The Theory, Reality and Pragmatism of Corporate Governance in Bankruptcy Reorganizations*, 72 The Am. Bankr.L.J. 103, 107 (1998). The value of creditors' claims to corporate earnings and assets, however, is fixed by contract. The business decisions of managers will therefore have no affect on the income of creditors.

 Therefore, "the general rule is that directors do not owe creditors duties beyond the relevant contractual terms absent 'special circumstances ..., e.g., ... insolvency....' [W]hen the insolvency exception does arise, it creates fiduciary duties for directors for the benefit of creditors." *Geyer v. Ingersoll Publications Co.*, 621 A.2d 784, 787 (Del.Ch. 1992) (citation omitted). The economic rationale for the "insolvency exception" is that the value of creditors' contract claims against an insolvent corporation may be affected by the business decisions of managers. At the same time, the claims of the shareholders are (at least temporarily) worthless. As a result it is the creditors who "now occupy the position of residual owners." *Id.* at 108.[13]

As *Geyer* demonstrates, Delaware courts have followed this reasoning and found that directors of insolvent corporations owe fiduciary duties to creditors. *See generally,* Brent Nicholson, *Recent Delaware Case Law Regarding Director's Duties to Bondholders,* 19 Del.J.Corp.L. 573 (1994). Indeed, in *Geyer,* "neither party seriously dispute[d] that when the insolvency exception does arise, it creates fiduciary duties for directors for the benefit of creditors." *Geyer,* 621 A.2d at 787. The critical question here is the scope of those duties.

*The scope of the defendants' duty to creditors*

The Defendants argue that the post-insolvency fiduciary duties only require that directors refrain from self dealing or preferring shareholders or favored creditors over the general creditor body. The Trustee counters that directors of an insolvent corporation owe duties of care, loyalty and good faith to creditors similar to those owed to shareholders of solvent corporations. He argues that by overstating the value of assets to incur additional debt, and thereby wrongfully prolonging the operations of the corporations, the directors violated those duties. Resolving that dispute requires a closer look at the Delaware treatment of the insolvency exception.

The chancellor's opinion in *Credit Lyonnais Bank Nederland v. Pathe Communications Corp.,* 1991 WL 277613 (Del.Ch. Dec. 30, 1991) contains the seminal analysis. That case grew out of the leveraged buyout of MGM. After the buyout, MGM had serious problems; it went into and out of bankruptcy, and was at all relevant times at least within "the vicinity of insolvency." *Id.* at *34. To get it out of bankruptcy, its principal shareholder entered into a contract ceding control to the lender that had financed the buyout in exchange for additional loans. The contract provided that the shareholder would regain control when the debt was paid

---

**12.** All the assignees are contract creditors, so we may ignore tort creditors.

**13.** In balance sheet terms, the value of the assets is allocated first to the satisfaction of the fixed claims of creditors; what is left over (the residual) is defined as "shareholder equity." When the corporation becomes insolvent, there is not enough asset value to satisfy the fixed claims and the number representing shareholder equity becomes negative. That negative number then represents the extent to which the value of the creditors' claims is less than the amount of those claims. Since the liability of shareholders is limited to their investments, anything the managers do to increase or decrease shareholder equity is primarily to the benefit or detriment of the creditors, rather than the shareholders, until the corporation regains solvency.

down to a certain amount. After a series of squabbles, the shareholder demanded that the corporate managers, who had been designated by the lender, cause MGM to sell certain assets to pay down the loan sufficiently to restore the shareholder's control. The managers, who, the court found, "could reasonably suspect that [the shareholder] might be inclined to accept fire-sale prices," did not authorize the sale. *Id.* The shareholder then sued them for breach of their fiduciary duty of loyalty to him.

The chancellor held that the managers did not breach any duty to the shareholder because they "owed their supervening loyalty to MGM, the corporate entity." *Id.* He expressed his reasoning as follows:

> In these circumstances where the company was in bankruptcy until May 28 and even thereafter the directors labored in the shadow of that prospect, Mr. Ladd and his associates were appropriately mindful of the potential differing interests between the corporation and its 98% shareholder. *At least where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise.* [FN55]
> The Ladd management was not disloyal in not immediately facilitating whatever asset sales were in the financial best interest of the controlling stockholder. In managing the business affairs of MGM, Mr. Ladd, and those he appointed owed their supervening loyalty to MGM, the corporate entity. It was not disloyal for them to consider carefully the corporation's interest in the . . . proposed transactions. . . . *[T]he MGM board or its executive committee had an obligation to the community of interest that sustained the corporation, to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity.*

*Id.* (emphasis added). In the famous footnote 55 to the first italicized sentence in the above quotation, the chancellor elaborated on his reasons for finding an insolvency exception to the general rule that corporate managers owe fiduciary duties only to shareholders. "The possibility of insolvency can do curious things to incentives, *exposing creditors to risks of opportunistic behavior,* and creating complexities for directors." *Id.* fn. 55 (emphasis added.) He went on to provide an illustration of such a "risk of opportunistic behavior," created by the ever-present incentive to gamble with other peoples' money.

In the footnote 55 hypothetical, the corporation's sole asset was a claim for $51 million with only a one-in-four chance of complete success and an assumed expected value of $15.55 million; its only debt, a $12 million liability to bondholders. The creditors can never get more than their $12 million contract claim, no matter how much the corporation gets, so they would happily accept a $12.5 settlement, even though that is less than the $15.5 million fair value of the claim. The shareholders, on the other hand, would gain only $3.55 million from a settlement at fair value, but have a one-in-four chance of realizing $39 million. Shareholders might want to reject a $15.5 million fair-value settlement offer, preferring to risk their $3.55 million share on a one-in-four chance for an eleven-fold return. If the gamble is successful, the first $12 million would go to creditors, leaving $39 million for shareholders, which is about eleven times the $3.55 million the shareholders would have realized from a fair value settlement. If it is unsuccessful, the creditors lose their $12 million, but the shareholders lose only $3.55 million. So the creditors would bear most of the risk, but the shareholders would stand to get all the reward of the gamble.

In the chancellor's view, this set of facts would create a dilemma for the directors. Notwithstanding the possible preference of risk-taking shareholders,

> if we consider the community of interests that the corporation represents it seems apparent that one should in this hypothetical accept the best settlement offer available providing it is greater than $15.55 million, and one below that amount should be rejected. But that result will not be reached by a director who thinks he owes duties directly to shareholders only. It will be reached by directors who are capable of conceiving of the corporation as a legal and economic entity. Such directors

will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act. [*Id.*]

The potential "opportunistic behavior" about which the chancellor expressed concern, then, was the disposition of property at "fire sale prices" for the sole benefit of the shareholder, and unreasonable risk-taking, also for the sole benefit of shareholders, with corporate assets. In the actual case and in the hypothetical situation of footnote 55, the problem was that directors serving shareholder interests might squander corporate assets at a time when creditors were at risk of nonpayment.[14]

The chancellor's solution was to shield such directors from liability to shareholders by declaring that their duty is to serve the interests of the corporate enterprise, encompassing all its constituent groups, without preference to any. That duty, therefore, requires directors to take creditor interests into account, but not necessarily to give those interests priority. In particular, it is not a duty to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative. Rather, the scope of that duty to the corporate enterprise is "to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity."

The chancellor in *Credit Lyonnais* did not have occasion to consider whether the directors' duty to the corporate enterprise was enforceable by creditors. The *Geyer* court, however, in an action by a creditor, held that directors' fiduciary duties to creditors arose when the corporation became insolvent, and

the directors' would be liable to the creditor for any breach of that duty. 621 A.2d at 789, 790–91. The chancellor held that the creditor stated a claim for breach of fiduciary duty by alleging that the director/sole-shareholder caused the corporation to surrender valuable assets for his own benefit while the corporation was insolvent. Again, the alleged wrongful act involved the disposition of assets for the benefit of shareholders, but to the detriment of "the entire corporate enterprise rather than any single group interested in the corporation at a point in time when shareholders' wishes should not be the directors' only concern." 621 A.2d at 789.

■ *Geyer*, like *Credit Lyonnais*, therefore involved dispositions of assets on terms unfair to the corporation and its creditors. Indeed, what one scholar wrote in 1993 appears to remain accurate: "All of the decisions in which the courts have allowed creditors to recover for breach of fiduciary duty have involved directors of an insolvent corporation diverting corporate assets for the benefit of insiders or preferred creditors." Laura Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency: Proper Scope of Directors' Duty of Creditors*, 46 Vand. L.Rev. 1485, 1512 (1993). As the author concludes, "courts are using the directors' duty to creditors to protect creditors' contractual rights to priority of repayment. None of the cases in which directors were held to have breached their duty expanded the directors' obligations to creditors beyond what the contract already provided." *Id.* at 1521 (emphasis added). On this theory, creditors have a right to expect that directors will not divert, dissipate or unduly risk assets necessary to satisfy their claims. That is the appropriate scope of a duty that exists only to protect the contractual and priority rights of creditors.

■ The "insolvency exception" to the general rule that directors owe no duty to creditors is, after all, an exception. Its scope

14. The phrase "vicinity of insolvency" seems to refer to the extent of the risk that creditors will not be paid, rather than balance sheet insolvency. In the footnote 55 hypothetical, the corporation was balance-sheet solvent (*i.e.*, the value of assets exceeded the value of liabilities). But the substantial risk that the sole asset would be dissi-

pated (in the sense that the corporation would turn down a fair-value settlement and take a 75% risk of loss) put the creditors at substantial risk. In the actual case, it is not clear that MGM was insolvent, but it is clear that absent competent management, it surely would have become so.

should be no greater than the problem it was intended to solve. That problem is the risk that creditors' rights would be defeated by directors' who gave shareholders prior claims to assets. This is not to say that the duty could not be violated by causing the corporation to incur unnecessary debt to or for the benefit of shareholders. Subjecting assets to unwarranted claims is a way of diverting them from legitimate corporate uses.[15] In an appropriate case, therefore, directors who cause their corporation to incur debt may be in breach of duties enforceable by creditors. This is not such a case.

In this proceeding, the Trustee does not allege that any assets were dissipated or diverted or put at undue risk for the benefit of shareholders or preferred creditors. He does allege that the Defendants prolonged the debtors' corporate lives by incurring debt on the basis of misleading financial information. The result was to sink the debtors deeper into insolvency. The Trustee does not allege, however, that the debtors did not get full value for the debts they incurred, or that they did not use that value in an effort to restore the corporation to financial health. That is, he does not allege that the Defendants did not use the corporate assets in "an informed, good faith effort to maximize the corporation's long-term wealth creating capacity." *Credit Lyonnais*, 1991 WL 277613 at *34.[16]

The Trustee has certainly alleged wrongful conduct. That conduct may even be fraudulent with respect to particular creditors who detrimentally relied on the alleged misrepresentations. The Trustee, however, has not attempted to allege fraud; he has attempted to allege breach of fiduciary duties. He has failed to do so.

*The Trustee's Negligence Claims Are Barred by The Moorman Doctrine*

▆▆▆▆▆ Illinois law determines whether the Trustee's negligence claims are sufficient as a matter of law.[17] Illinois courts follow the *Moorman* doctrine, also known as the economic loss rule, which generally says that losses of a solely economic nature cannot be recovered in a tort action. *See In re Chicago Flood Litig.*, 176 Ill.2d 179, 198–199, 223 Ill.Dec. 532, 680 N.E.2d 265 (1997). The Illinois Supreme Court has "applied the economic loss rule to claims that services were performed negligently [and has] also held that '[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract.'" *Id.*, 176 Ill.2d at 199, 223 Ill.Dec. 532, 680 N.E.2d 265 (quoting *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986) (second alteration original)). According to the Trust-

15. Indeed, the incurring of an obligation with fraudulent intent or for inadequate consideration may be a fraudulent transfer. *See* § 548(a). This form of conduct may also be grounds for the equitable subordination of those claims. *See* § 510(c); *In Matter of Lifschultz Fast Freight*, 132 F.3d 339 (7th Cir.1997).

16. The inattention and bad faith that the Trustee does allege relate only to the redating of accounts receivable, not the use of corporate assets.

17. Under either Illinois choice-of-law rules or an exercise of this Court's independent judgment, *see* footnote 11, above, Illinois substantive law governs the Trustee's negligence claims. As all the conduct alleged to be negligent took place in Illinois, it makes sense to apply Illinois substantive law. Illinois choice-of-law rules dictate the same result. As the Seventh Circuit recently explained:

The Illinois Supreme Court uses the 'most significant relationship' test for choosing the appropriate law in tort cases. In practice, this means that 'the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties.' A court is to determine whether Illinois has the more significant relationship by examining the following factors: 1) the place of the injury, 2) the place where the injury-causing conduct occurred, 3) the domicile of the parties, and 4) the place where the relationship between the parties is centered. The Illinois courts also consider 'the interests and public policies of potentially concerned states ... as they relate to the transaction in issue.'
*Fredrick v. Simmons Airlines, Inc.*, 144 F.3d 500 (7th Cir.1998). Here, although the Debtors are Delaware corporations, their corporate headquarters are in Carol Stream, Illinois. Hence, any injury to the corporation would seem to have taken place in Illinois. Likewise, although the creditors who assigned their claims to the Trustee may have been located outside Illinois, the injury-causing conduct is alleged to have taken place within Illinois and that is also where the relationship between the parties is centered.

ee, Illinois case law holds that the economic loss rule is inapplicable when a duty "arises outside of contract or the Defendants have a common law duty to the plaintiffs." (Pl.'s Mem. in Opp'n, p. 23.) The Court disagrees.

In *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.,* a case involving accountant malpractice, the Illinois Supreme Court stated that "[w]here a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for negligent breach of that duty." 159 Ill.2d 137, 162, 201 Ill.Dec. 71, 636 N.E.2d 503 (1994). The court explained that an attorney-client or accountant-client relationship, as opposed to an architect-client relationship, results in something intangible which "cannot be memorialized in contract terms" and the "duty to observe reasonable professional competence exists independently of any contract." *Id.,* 159 Ill.2d at 163–164, 201 Ill.Dec. 71, 636 N.E.2d 503. Illinois courts have recognized, however, that the exception to the *Moorman* doctrine enunciated in *Congregation of Passion* is limited to professional malpractice claims and, as *Congregation of Passion* itself makes clear, not all professional relationships fall within this limited exception. *See, e.g., Weisblatt v. Chicago Bar Ass'n,* 292 Ill.App.3d 48, 54, 225 Ill.Dec. 993, 684 N.E.2d 984 (1997) ("The only exceptions to this prohibition [against recovering in tort for pure economic loss] are in the areas of fraudulent and negligent representations[18] and professional malpractice." (citations omitted)).

The duties owed by corporate directors and officers to a corporation and its shareholders and creditors are not governed by the law of professional malpractice, but rather principles of fiduciary duty embodied in corporate law. Hence, the limited exception to the *Moorman* doctrine for some professional malpractice claims is inapplicable to this case. *Cf. Serfecz v. Jewel Food Stores, Inc.,* 1998 WL 142427, at *4 (N.D.Ill. Mar. 26, 1998) (although recognizing that *Congregation of Passion* "has been read [by Illinois courts] as articulating an exception to the

*Moorman* doctrine for professional malpractice," nonetheless applying the exception to common law waste claims). The Trustee's Count II negligence claims, therefore, are barred by the *Moorman* doctrine and must be dismissed.

## CONCLUSION

The Court concludes that the Trustee has standing to pursue the Count I breach of fiduciary claims against the Defendants as assignee of the unsecured creditors claims. Those claims are not barred by Ben Franklin Retail Stores, Inc.'s certificate of incorporation. Count I, however, fails to state a claim upon which relief can be granted. Because of the Illinois rule against the recovery of economic losses in tort, the Trustee's attempt in Count II to allege a claim for negligence also fails.

Because the Trustee has failed to state a claim upon which relief may be granted in either Count of his Second Amended Complaint, that complaint, and this proceeding, will be dismissed.

---

18. The negligent representation exception is only applicable if the "defendant is in the business of supplying information for the guidance of others in their business transactions." *Peter J. Hartmann Co. v. Capital Bank and Trust Co.,* 296 Ill.App.3d 593, 230 Ill.Dec. 830, 694 N.E.2d 1108, 1117 (1998) (citing *Moorman Mfg. Co. v. Nat. Tank Co.,* 91 Ill.2d 69, 89–91, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982)).